## FIRST NAT. BANK OF BENSON BOROUGH v. OCEAN ACCIDENT & GUARANTEE CORPORATION, Limited.

(District Court, W. D. Pennsylvania. November 2, 1923.)

### No. 577.

1. **Reformation of instruments ⊕=45(2)—Evidence must show actual agreement with reasonable certainty.**

   To authorize reformation of a written contract on the ground of mutual mistake, the court must be able to ascertain with reasonable certainty from the evidence the exact contract which the parties had agreed upon, but failed through mistake to put into writing.

2. **Reformation of instruments ⊕=43—Instrument presumed to correctly express intention of parties.**

   A writing sought to be reformed is presumed to express correctly the intention of the parties, and this presumption can only be overcome by testimony that is clear and convincing beyond reasonable controversy.

3. **Principal and agent ⊕=119(1)—Reformation of instruments ⊕=19(1)—Mistake, to authorize reformation, must be mutual; authority of agent must be shown.**

   To authorize reformation of an instrument for mistake, the mistake must have been mutual, and where the contract was made by an agent of defendant his authority to make the contract sought to be substituted must be shown.

4. **Reformation of instruments ⊕=45(14)—Evidence held not to warrant reformation of policy of burglary insurance.**

   Evidence *held* insufficient to warrant reformation of a policy of burglary insurance issued to a bank. so as to make it cover in its entirety securities kept in the vault outside the safe.

In Equity. Suit by the First National Bank of Benson Borough against the Ocean Accident & Guarantee Corporation, Limited. Decree for defendant.

Reed, Smith, Shaw & Beal, of Pittsburgh, Pa., and Charles F. Uhl, Jr., of Somerset, Pa., for plaintiff.

Ernest Irwin and W. Clyde Grubbs, both of Pittsburgh, Pa., for defendant.

THOMSON, District Judge. This is a bill in equity for the reformation of a policy of insurance issued by the defendant to the plaintiff bank, so as to express the true intent of the contract between the parties, as plaintiff avers it to be, and that the contract, so reformed, be substituted in lieu of the insurance policy as written and delivered. The defendant is a corporation organized under the laws of Great Britain, and issues policies of insurance against loss by burglary, robbery, etc. A policy of insurance, dated February 6, 1918, was issued by the company, and delivered to the plaintiff, insuring against loss by burglary of moneys and securities held in a burglar-proof safe within a safe-deposit vault, in the sum of $50,000, and contains a provision that 10 per cent. of the total amount of the insurance will apply against securities held outside of the burglar-proof safe, but within the vault.

It is the contention of the plaintiff, and on that ground reformation is sought, that the actual contract of insurance between the parties was

to insure the plaintiff against loss by burglary of securities held by the plaintiff bank for its customers, and kept by it in safe-deposit boxes in its vault, outside its burglar-proof safe. The policy was actually delivered to the plaintiff in the month of March, 1919. On or about September 26, 1919, the bank was robbed by unknown persons, and some $62,000 aggregate par value of Liberty bonds and Victory notes belonging to the bank and its customers were stolen from the safe-deposit boxes within the vault but outside the safe. This loss is not covered by the policy as issued and delivered, except to amount of 10 per cent.

Plaintiff contends, and has offered evidence in support of the contention, that the bank having secured a large number of Victory notes which had been purchased from the government by its customers, the president and cashier discussed the advisability of obtaining insurance which would protect the bank and its customers against loss by burglary of the securities kept by the bank in the safe-deposit boxes within its vault 'and outside its burglar-proof safe; that the president called Mr. Parnell, an agent of the defendant company, at Windber, and asked him to obtain for the bank such insurance to the extent of $50,000; that Mr. Parnell replied that he would obtain such insurance for the bank, and that it might consider itself protected from such loss from then on; that Parnell had been writing insurance for the bank from the time of its incorporation in 1906 or 1907; that they took his advice and reposed confidence in his judgment in matters of insurance; that he had previously measured the plaintiff's burglar-proof safe inside the vault, to get information for the defendant company upon the issuance by it of prior policies, and was familiar with the vault and the location of its safe-deposit boxes; that on March 3, 1919, Parnell brought the policy to the bank when the board was in session, and that the president, James E. Cassler, went out of the meeting and received the policy from Parnell; that the former asked Parnell, on delivering the policy, whether that was the policy he had asked for their protection for the securities in the safe-deposit boxes in the vault, and was assured that it was; that the policy was then put in the safe, and there remained until after the robbery; that in April of 1919, a representative of the American Surety Company called at the bank, and told the assistant cashier that he did not believe the bank had insurance covering loss from the safe-deposit boxes in the vault; that on calling Parnell by telephone, the president of the bank was assured by Parnell that such loss was covered by the policy; that about a week later, one Hutchinson, an employee of Parnell, came to the bank and in the presence of the assistant cashier said that Mr. Parnell had sent him to tell them that that policy was what they wanted, and that they were protected under it; that, a few days after the robbery, Parnell and the adjuster of the defendant company were in the bank, and Parnell 'again asserted that the bank was fully protected for the securities held in trust in the vault; that later, on November 6, 1919, Parnell admitted, in the presence of witnesses, the foregoing matters as to the request of the bank, the assurance which he had given them as to the protection of the policy, the execution and delivery of the policy as a result and his statement at the time of delivery as to the coverage of

the policy; that on that occasion, after Parnell left, a statement addressed to the bank was dictated, embodying the statements made by Parnell, and which, a little later, he signed, the statement being offered in evidence. In addition, plaintiff offered a certificate issued by the insurance commissioner of Pennsylvania, showing the defendant company's certificate of authority appointing Parnell its agent.

[1-3] Upon these averments of facts, of which I have endeavored simply to give the substance, plaintiff relies for the reformation of the policy in question. At this point it would be well to have clearly in mind the legal principles which govern in determining the question of the plaintiff's right to the relief sought. These are definitely settled by the authorities, and may be succinctly stated as follows: First, to reform a written contract on the ground of mutual mistake, the court must be able to ascertain with reasonable certainty from the evidence, the exact contract which the parties had agreed upon, but failed, through mistake, to put into writing. If this cannot be done, reformation cannot be had. Second, the writing sought to be reformed, is presumed to express correctly the intention of the parties, and this presumption can only be overcome by testimony that is clear and convincing beyond reasonable controversy. Third, mutual mistake of the parties, that is, the bank and the insurance company, must be shown; not the mistake of one, but the mistake of both; and in this case, as the agreement set up by the plaintiff is that made by an agent of the defendant company, the plaintiff must show that the agent had authority to make the agreement in question.

[4] Applying to the case here these legal principles, it would appear, for more reasons than one, that plaintiff's bill cannot be sustained. In the first place, the plaintiff has not established by that measure of proof which the law requires, that is, with clearness and certainty, that the agreement with the defendant company's agent was as averred in the bill. It is clear that the plaintiff had carried burglar insurance with the defendant company from 1913. This consisted of three policies, and that in January, 1919, these were surrendered and canceled, and a $50,000 policy taken out in their place. None of these policies covered insurance outside of the burglar-proof safe. The policy, therefore, that the plaintiff claims to have been seeking, was a radically different policy, so far as its coverage was concerned. The agreement upon which plaintiff relies as to the policy involved in the suit was a telephone conversation on February 8, 1919, between James E. Cassler, the president of the bank, and Mr. Parnell, the agent of the defendant company, In substance, he testifies that bonds which their customers had purchased were coming in from Cleveland, and that they did not have room for them in the safe, and that the bank was keeping them in the safe-deposit boxes in the vault outside of the safe; that in the presence of A. E. Cassler, the cashier, he called up Mr. Parnell with reference to the insurance. The witness testifies in chief:

"Q. What did he say regarding the issuance of a policy? A. He asked us how much insurance we wanted. Q. What did you tell him? A. Fifty thousand is what I told him. Q. What was said then? A. Then I asked him when that insurance would go into force. He said, 'Right now.' So I made the remark, 'Are we protected from now on?' He said, 'You are.' "

On cross-examination he testifies:

"Q. And you were asking them for a policy the like of which you had never had before? A. Yes, sir. Q. You testified in chief that you called up Mr. Parnell on February 8th and told him that you wanted a policy of insurance to cover the bonds and securities in safe-deposit boxes in the vault outside the safe, belonging to customers. Is that true? A. Yes, sir. Q. You are sure of that? A. I am. Q. Positive? A. Positive."

This testimony is corroborated to a certain extent by A. E. Cassler, who says he was present when the telephone conversation occurred. When asked what he heard James E. Cassler ask for over the telephone, he answered:

"As near as I can recall, he said that we wanted insurance to cover the safe-deposit boxes and the bonds that we were getting in and held in trust."

This is the whole testimony of the plaintiff as to the agreement at the time it was made. What followed at the time of the delivery of the policy, and at any subsequent date, is simply corroborative of what Mr. Cassler testifies the agreement was. He says that on March 3d, while in a directors' meeting, Parnell came to the bank, and he was called out of the meeting, and Parnell handed him the policy of insurance. When asked what then occurred, he testified:

"I asked him whether that was the policy that I asked for our protection, for our bonds held in trust in the safe-deposit boxes in the vault. Q. What did he say? A. He assured me it was. Q. What did you do with the policy then? A. Took it in the vault, and put it in the safe, and went back to the directors' meeting."

No one else was present when the policy was delivered. Some month or six weeks later, being told by a representative of the American Surety Company that the bank was not protected, Mr. Cassler says he called up Mr. Parnell by telephone. He says:

"Q. You knew his voice? A. Yes; and I asked him whether we were fully protected on our bonds held in trust in our safe-deposit boxes in the vault. He assured me that we were fully protected. Q. Did you tell him why you were asking? A. No; I didn't."

This testimony as to what the agreement was, even if not controverted, could hardly be held sufficiently clear and convincing to justify the relief sought. But it becomes wholly inadequate in the light of the evidence and the surrounding facts. It clearly appears that, in handling insurance matters for the defendant company, Mr. Parnell had always referred the same to W. M. Reed & Co., of Pittsburgh, who for many years were the general agents for the defendant company in Western Pennsylvania, with a notation as to what was desired; that, when the policy was issued by the company, it was received by Parnell from Reed & Co., and, when entered on his records, the policy was delivered by him and the premiums collected. Mr. Parnell testifies that he was at Holsopple on February 6, 1919, as shown by his diary, and saw Mr. Cassler, who spoke to him about $50,000 additional insurance; that they had a large amount of bonds and securities at that time, and might not have them long, and wanted to know if they could cancel or reduce the insurance in the near future; that he went home, and the next day wrote a letter to Reed & Co. for the additional

insurance, the letter being Defendant's Exhibit K. In the letter he states:

"You have policy No. M. B. 206,930, covering for $50,000 on the First National Bank of Benson Borough, Holsopple, Pa. Bind $50,000 additional insurance policy, but before issuing the policy they desire to know whether or not they can place this insurance for a short time, and if it is possible to have insurance written from time to time to cover while they have a large amount of securities, bonds, etc., on hand. * * * As soon as we receive your reply, we will take the matter up with them and advise you."

The following day Reed & Co. replied:

"We have your letter of February 7th, and are binding $50,000 additional insurance. We have referred your inquiry to the head office to see if they can work out a proposition which would be acceptable to the assured. You will be advised immediately upon receipt of the home office instructions."

On February 14th Reed & Co. again write to Parnell, in which they say:

"Referring to your letter of February 7th, the corporation has stated that the policy must be written at a premium charge for the additional amount of insurance the assured requires. This insurance can be reduced or increased at any time and the premium will be calculated on a pro rata basis. This is a very equitable arrangement, and we trust that we will secure the bank's order to write the additional $50,000 we have been binding."

This is followed by Parnell's letter of February 19th to Reed & Co., in which he says:

"Please issue bank burglary policy for $50,000 additional insurance, in accordance with your letter of the 8th inst. binding same. Premium payable in three annual installments. This policy is being written with the understanding that they can secure pro rata cancellation at any time in accordance with your letter of the 14th inst. Please let us have the new policy at your earliest convenience."

To this Reed & Co. reply on February 20th, acknowledging the receipt of the letter, and state that they are having the policy written. He further states that he received the policy about February 25th, and to the best of his knowledge mailed it to the bank, as was his custom; that he was not in Holsopple again until March 20th, on which date he collected the premium; that Mr. Cassler at that time spoke to him as to a form of insurance covering bonds and securities in the vault, written at 25 per cent. less rates, and asked him to inquire into that form of insurance. He stated that, if this form of insurance could be secured, they would cancel the other form; that thereupon, on the same date, he wrote to Reed & Co. the letter (Exhibit R) with reference to the matter, and received their reply on March 24th (Defendant's Exhibit S). In this reply they state that, if the insurance is written to cover bonds and securities exclusively, a discount from the regular bank burglary rates of 25 per cent. applies. They then state:

"You intimate that the bonds and securities are kept in the vault. Please note that the policy covers only 10 per cent. of the amount of the insurance granted by the policy on money and securities in the vault outside of the safe. We might add that this is only a fire-proof vault, and it would be very difficult to obtain any great amount of insurance on money or securities not kept in the safe, and the premium for such insurance would be very high."

From this correspondence, written at a time when a lawsuit was not contemplated, the purpose and intention of Parnell is clearly manifest. In the correspondence it nowhere appears that Parnell sought to obtain in the first instance a policy different from those previously issued; in other words, a policy covering the safe-deposit boxes in the vault outside the safe. To so find would be, not only to ignore his testimony wholly, but to ignore the almost indubitable evidence contained in the letters which he wrote and received at the time, covering the very matter in question. This the court cannot do. That he later made certain verbal statements, and signed a paper inconsistent with his testimony on the stand, is quite evident. But this does not alter the vital fact, clearly disclosed by the correspondence, that he was not mistaken as to the policy which he applied for, received, and delivered. The bank may have been mistaken as to the scope of the policy, but that is not sufficient on which to found a reformation. Not *one* party, but *both,* must be mistaken.

In the second place, the testimony fails to establish a parol contract of insurance complete in itself, and fully determined upon in all its general terms. It will not do to say that the details were not agreed upon, because it was to be the same as prior insurance, for the reason that plaintiff is setting up and claiming a very different policy from that theretofore issued. The alleged parol agreement fixes no time limit for the policy, nor the amount of the premium to be paid. No established rate existed, and hence no consideration was agreed upon. The court has not the power, let alone the disposition, to fix for the parties the premium which should be paid for a hazard so greatly increased that the company had never before assumed it. How can the oral contract, lacking in such vital particulars, be substituted for the policy issued?

In the third place, there is no substantial evidence that the agent, Parnell, had any power or authority to make the contract in question. No such authority is found in his form of contract with the defendant company, nor in the certificate sent by the defendant to the state department at Harrisburg, nor in the license issued to the agent by the state of Pennsylvania. On the contrary, his contract with the company provides:

"That no act, promise, stipulation, or agreement * * * made or given by the agent shall bind the corporation in any respect, until the same has been approved, ratified, and confirmed in writing by the general manager of the corporation."

In addition, the testimony shows that Parnell never, during the course of his agency, made up or prepared the policies of burglary insurance, and never countersigned the policies sent him by the company. His sole duty appears to have been to solicit insurance, deliver the policies, and collect the premiums. The evidence shows that Mr. McInness, in charge of the department of burglary insurance in New York, had the deciding voice on the issuance of policies, and that all applications for burglary insurance had to be submitted for action to the home office.

And, finally, the plaintiff was guilty of gross negligence in failing to read the policy during the months that it was in its possession. The

president accepted the policy for the bank without reading it, on the assurance, he says, that it was the policy that he had asked for, for the protection of the bonds held in trust in the safe-deposit boxes in the vault. A casual examination of the policy would have shown that this was not the fact. He knew that it was a new kind of policy which they had never had before, from this company or any other. He must have known that the risk to the company of such a policy, covering the contents of the vault, would be very much greater than one covering the contents of the burglar-proof safe, and that the premiums on such policy would be correspondingly higher. He saw the amount of the premium paid on the policy delivered, and knew that it was just the same as on the $50,000 policy taken out in the preceding January. Besides this, his suspicion as to what the policy covered, was raised a few weeks later, and still he did not read the policy; and still again, when he was practically assured by an agent of the American Surety Company, that the policy could not cover the safe-deposit boxes, he still did not read the policy, although lying at his hand in the safe, contenting himself with calling up Parnell as to the coverage of the policy. And so this inaction, this persistent failure on the part of the bank to do that which ordinary prudence and care demanded, continued until after the loss occurred. Such action constitutes in law supine negligence, such as justly bars the plaintiff from the equitable relief which it now seeks.

Many authorities might be cited to sustain the legal propositions announced in this opinion, but a few only are necessary:

Measure of proof: Howland v. Blake, 97 U. S. 624, 627, 24 L. Ed. 1027; Snell v. Insurance Co., 98 U. S. 85, 25 L. Ed. 52; Campbell v. Northwest Imp. Co., 229 U. S. 584, 33 Sup. Ct. 796. 57 L. Ed. 1330; Philippine Sugar Estates Co. v. Philippine Islands, 247 U. S. 385, 38 Sup. Ct. 513, 62 L. Ed. 1177.

As to establishment of the exact contract agreed upon: Travelers' Insurance Co. v. Henderson, 69 Fed. 762, 16 C. C. A. 390; New York Life Insurance Co. v. McMaster, 87 Fed. 63, 30 C. C. A. 532.

Mutual mistake: Cooper v. Insurance Co., 50 Pa. 299, 88 Am. Dec. 544; Levinton v. Ohio Insurance Co., 267 Pa. 448, 110 Atl. 295; Riegel v. American Insurance Co., 140 Pa. 193, 21 Atl. 392, 11 L. R. A. 857, and cases cited, 23 Am. St. Rep. 225.

Power of agent to bind company: Benner v. Fire Insurance Co., 229 Pa. 75, 78 Atl. 44, 140 Am. St. Rep. 706, and cases cited; Hottner v. Insurance Co., 31 Super. Ct. R. 46.

Negligence in failing to read policy: Bailey v. Lisle Mfg. Co., 238 Fed. 257, 152 C. C. A. 3, and cases cited; Rinker v. Etna Life Insurance Co., 214 Pa. 609, 64 Atl. 82, 112 Am. St. Rep. 773; Great Western Mfg. Co. v. Adams, 176 Fed. 325, 99 C. C. A. 615.

It follows that the bill must be dismissed.