FIREMEN'S INS. CO. v. LASKER et al.

Circuit Court of Appeals, Eighth Circuit.
March 22, 1927.

No. 7611.

1. Reformation of instruments ⚖45(14)—Reformation of use and occupancy insurance policy, as affecting liability for partial suspension, held unwarranted by evidence.

Evidence held insufficient to entitle insured to reformation of use and occupancy insurance policy, as respects liability for partial suspension.

2. Reformation of instruments ⚖43—One seeking reformation has burden of showing mutual mistake, or mistake of one party and fraud or inequitable conduct of the other.

Complainant, seeking reformation of contract, has burden of proving either mutual mistake, or mistake of one party and deceit, fraud, or inequitable conduct of the other.

3. Reformation of instruments - ⚖45(2)—Clear and convincing proof, and not mere preponderance of evidence, is necessary to warrant reformation of contract.

Mere preponderance of evidence is insufficient to warrant reformation of contract, but proof must be of the clearest and most satisfactory character, plain and convincing beyond reasonable controversy.

4. Insurance ⚖507—Partial suspension clause of use and occupancy insurance policy held not ambiguous or uncertain.

Partial suspension clause of use and occupancy insurance policy, providing that the per diem liability during partial suspension of business shall be limited to the actual loss sustained, "not exceeding that proportion of the per diem liability that would have been incurred by a total suspension of business which the actual per diem loss sustained during the time of such partial suspension bears to the per diem loss which would have been sustained by a total suspension of business," held not ambiguous or uncertain.

**5. Insurance ⟨⟩146(1)—In national courts, insurance contracts are construed according to meaning of terms used, when given their ordinary and popular sense.**

In national courts, contracts of insurance, like other contracts, should be construed according to the sense and meaning of the terms which the parties have used; such terms being understood and given effect in their plain, ordinary, and popular sense.

**6. Insurance ⟨⟩146(3)—Rule requiring liberal construction in favor of insured applies only where ambiguity renders contract susceptible of two interpretations.**

It is only where ambiguity in contract makes it fairly susceptible of two interpretations that the rule of liberal construction in favor of the insured may be applied.

Appeal from the District Court of the United States for the Eastern District of Arkansas; Jacob Trieber, Judge.

Suit by Myron B. Lasker, operating as the Imperial Laundry, and others, against the Firemen's Insurance Company. Decree for plaintiffs, and defendant appeals. Reversed and remanded, with instructions.

Frederick D. Silber, of Chicago, Ill. (Andrew H. Scott and Verne McMillen, both of Little Rock, Ark., and Clarence J. Silber, of Chicago, Ill., on the brief), for appellant.

George A. McConnell, of Little Rock, Ark. (G. De Matt Henderson, of Little Rock, Ark., on the brief), for appellees.

Before LEWIS and VAN VALKENBURGH, Circuit Judges, and PHILLIPS, District Judge.

PHILLIPS, District Judge. This is an appeal from a decree in a suit in equity brought by Myron B. Lasker (hereinafter called the plaintiff) against the Firemen's Insurance Company (hereinafter called the defendant) to reform a use and occupancy insurance policy, and recover for a loss under the policy as reformed. It was originally commenced as an action at law. After the defendant filed its answer, the plaintiff filed an amended complaint, in which he alleged that the provision in the policy of insurance with reference to the liability for partial suspension, because of a mutual mistake of the parties, failed to express the contract agreed upon and intended, and prayed for reformation of the contract. The trial court thereupon entered an order transferring the cause to the equity docket.

[1] On June 25, 1921, the plaintiff took out three use and occupancy insurance policies, each for the sum of $10,000. Each policy, computed on a basis of 300 working days in the year, provided a maximum daily total suspension loss indemnity of $33.33. Renewal policies were taken out in the years 1922 and 1923, and the loss occurred on April 11, 1924. This suit is upon one of such renewal policies issued by the defendant. The portions thereof material to this inquiry read as follows:

"The conditions of this contract are that if the building, described above, and/or machinery and/or equipment or stock (insert 'and/or stock' if covering liability for suspension of business due to damage to, or destruction of stock, otherwise policy shall not so cover) contained therein, be destroyed or damaged by fire occurring during the term of this policy so as to necessitate a total or partial suspension of business, this company shall be liable under this policy for the actual loss sustained of net profit on the business which is thereby prevented, and such fixed charges and expenses pertaining thereto as must necessarily continue during a total or partial suspension of business and such expenses as are necessarily incurred for the purpose of reducing the loss under this policy, * * * subject to the following conditions and limits, to wit:

"Total Suspension Clause: The per diem liability under this policy during the time of total suspension of business of all the properties described herein shall be limited to the 'actual loss sustained,' not exceeding 1/300 33.33 of the amount of this policy for each business day of such suspension, due consideration being given to the experience of the business before the fire and the probable experience thereafter.

"Partial Suspension Clause: The per diem liability under this policy during the time of partial suspension of business shall be limited to the 'actual loss sustained,' not exceeding that proportion of the per diem liability that would have been incurred by a total suspension of business which the actual per diem loss sustained, during the time of such partial suspension, bears to the per diem loss which would have been sustained by a total suspension of business for the same time of all properties described herein, due consideration being given to the experience of the business before the fire and the probable experience thereafter."

The amended complaint contains, among others, the following allegations:

"Plaintiff states that at the time he purchased and paid for said insurance that he purchased the same from W. B. Worthen Company, bankers, of Little Rock, Arkansas, agent for the defendant herein, and also agent for the insurance companies issuing

the other two policies above referred to. Said agent solicited the business from the plaintiff, and stated to the plaintiff that he ought to purchase an amount of insurance which would be sufficient to pay him in case of fire on account of the loss of use and occupancy of his business, *the sum of $100 per day, or such portion of said $100 per day as his actual loss would be in the case of partial suspension;* that said agent represented to the plaintiff that he should purchase an aggregate of $30,000 of insurance, in order to procure such use and occupancy protection, and this the plaintiff agreed to do and ordered the same from said agent, and said agent represented and stated to the plaintiff at the time of the issuance of said polices to the plaintiff that the insurance which it procured for him in the defendant company, together with the other two policies referred to, which were of like terms and amount, *would pay him for use and occupancy loss in case of fire an amount not to exceed $100 per day in the event of total suspension, and that in the event of partial suspension it would pay him his actual loss not to exceed the sum of $100 per day."* (Italics ours.)

Plaintiff also filed a pleading, which he denominated "Response to Motion of Defendant to Make More Specific," in which he alleged that he suffered a partial suspension for 121 days, resulting in an actual loss of $84.11 per day, or a total of $10,177.31, and that he paid out for expenses necessarily incurred for the purpose of reducing the loss $310.78, and that in the negotiation with the adjusters he agreed that, if the suspension had been total during the period of 121 days, the actual per diem loss would have been $275.92 per day.

The terms of the policy defining the liability for partial suspension of business provided *that it should be such proportion of the maximum per diem liability, as the amount of the actual loss resulting from the partial suspension would be of the amount of the loss which would have resulted had the suspension been total.* It therefore follows that plaintiff's per diem loss for the partial suspension, computed according to the written provisions of the policy, is such proportion of $33.33 as $84.11 is of $275.92, or $10.16 per day. On this basis, the loss for the 121-day period was $1,229.36. To this amount must be added $103.59, one-third of the expenses incurred for reducing the loss. The total liability under the policy as written, therefore, was $1,332.95. The insurance company admitted its liability for this amount and tendered such sum to the plaintiff. This the plaintiff refused. In its answer, the insurance company denied the allegations upon which the prayer for reformation was based, and renewed its tender of $1,332.95.

The only issues of fact raised by the pleadings were with reference to the question of reformation. On these issues, the plaintiff testified in his own behalf, in part, as follows:

"At the time I took out this U. and O. insurance I had carried $50,000 worth of insurance on my machinery, and upon the suggestion of Mr. Newell—he declared that I ought to carry this U. and O. insurance in case of a loss by fire or otherwise, and at that time he explained to me that this policy would *cover $100 insurance per day in case of a total loss, and the pro rata of $100 per day in case of a partial loss.*

"This policy states it is for $33.33 per day, and I had two other policies for a like amount aggregating $100 a day use and occupancy loss.

"As I stated, Mr. Newell declared to me that $100 a day insurance covered in these three policies would be paid to me in case of a total suspension of business. He also explained to me, in case of a partial suspension or partial loss, that I would receive *the pro rata of $100 a day,* and with that explanation and understanding I took these policies." (Italics ours.)

At the time the original policies were issued, the insurance companies were represented by the W. B. Worthen Company. R. W. Newell was the secretary and manager of the insurance department of Worthen Company. Newell, called as a witness in behalf of the plaintiff, testified in part as follows:

"I represented to Mr. Lasker that I was providing him with indemnity that would provide him with *$100 per day in case of a total loss, or a pro rata of that in the case of a partial suspension.* With that understanding and representation I issued and delivered to him, and he paid for that policy.  *  *  *

"I said awhile ago that I represented to Mr. Lasker that in case of a total suspension of business he would be protected in the amount of $100 a day, *and I represented to him that if his partial suspension amounted to $100 a day he would be protected,* I sold him the contract not to exceed $100 per day or any portion thereof that could be proven due." (Italics ours.)

"The Court: Mr. Newell, at the time you issued the policy, what was the intention, your intention, in issuing it, as to this clause, this partial suspension clause, and what did

you represent to Mr. Lasker, and what did you intend to do as you construed it?

"A. At that time as I construed the contract I issued to him, these three policies provided a per diem indemnity to him of $100 per day for a total suspension of his business *or a pro rata part of $100 for the partial suspension,* which would have to be predicated upon his book records on the loss, and with— (Italics ours.)

"Q. Was that the understanding that you had given to Mr. Lasker?

"A. Yes, sir.

"Q. And with that understanding he accepted the policy?

"A. Yes, sir. * * *

"Q. Did you have any particular conversation about the partial suspension?

"A. Of course it happened in 1921, but I will say this: That was my interpretation of the contract, but it would be very difficult for me to remember as far back as 1921; but in writing a new form it would be almost, you might say, necessary for that point to have arisen. I can only say it in that way. I wouldn't like to make a positive statement on that score."

Upon this evidence, the trial court reformed the contract and gave judgment in favor of the plaintiff, on the basis of a partial suspension loss of $84.11 per day for 121 days with interest, for a statutory penalty of 12 per cent. thereof, and for the sum of $375.82 attorneys' fees, aggregating $4,-585.01.

[2, 3] The rule is firmly established that, in cases of this kind, the burden is on the complainant to prove the mutual mistake, or the mistake of one party, and the deceit, fraud, or inequitable conduct of the other party, to the contract upon which the complainant relies, for a reformation of the contract, and that it is not sufficient for him to establish such facts by a mere preponderance of the evidence, but the proof thereof must be of the clearest and most satisfactory character —proof that is plain and convincing beyond reasonable controversy. Southern Surety Co. v. United States Cast Iron Pipe & F. Co. (C. C. A. 8) 13 F.(2d) 833, 836, 837, 838; Bailey v. Lisle Mfg. Co. (C. C. A. 8) 238 F. 257; Sun Co. v. Vinton Petroleum Co. (C. C. A. 5) 248 F. 623; Philippine Sugar Estates Development Co. v. Government of the Philippine Islands, 247 U. S. 385, 38 S. Ct. 513, 62 L. Ed. 1177; Griswold v. Hazard, 141 U. S. 260, 11 S. Ct. 972, 999, 35 L. Ed. 678; Snell v. Atlantic F. & M. Ins. Co., 98 U. S. 85, 26 L. Ed. 52.

Does the proof in the instant case measure up to the above rule? The testimony of plaintiff does not support the allegations of the complaint. He testified that the agent represented to him that the three policies would pay $100 per day in case of a total loss and "the pro rata of $100 per day in case of a partial loss." He does not say what this pro rata or proportion was to be based upon, but manifestly it would have to be based on the proportionate relation of two other quantities. From the foregoing, it will be seen that the testimony of the plaintiff not only fails to support the allegations of the complaint, but, so far as it goes, is in harmony with the written provision of the policy.

Newell during his testimony twice stated that he represented to the plaintiff that the indemnity for partial suspension would be a pro rata of $100 per day. What we have said about the testimony of the plaintiff equally applies to these statements of Newell. It is true that Newell during his testimony made one statement that tends to support the allegations of the amended complaint. He said: "I represented to him [plaintiff] that if his partial suspension amounted to $100 a day he would be protected. I sold him the contract not to exceed $100 per day, or any portion thereof that could be proven due." This, however, is at variance with the other statements of Newell and with the testimony of plaintiff. Furthermore, Newell's testimony shows that he had no clear recollection of what transpired between him and plaintiff at the time the original policies were written. He was asked if he and the plaintiff had any particular conversation about the partial suspension clause, and in response thereto replied that he would not make any positive statement as to whether any particular conversation took place.

It is our opinion that the plaintiff wholly failed to establish the alleged mutual mistake by evidence of the clearest and most satisfactory character. To permit a party to enlarge the obligations of a solemn written contract by the character of proof introduced in the instant case would destroy the sanctity of written contracts, and set at naught the very purpose which actuates honest persons when they reduce the terms of their contract to written form. We conclude that the court erred in granting reformation.

[4-6] Counsel for the plaintiff contend, however, that the decree of the court may be supported without reformation of the contract. They say that the language of the contract of insurance is ambiguous and uncertain and is subject to the interpretation that the in-

demnity for partial suspension shall be the total loss sustained not exceeding $33.33 per day, and that, since the parties waived the right to trial by jury by written stipulation, the judgment may be permitted to stand, even if the court erred in granting reformation. Whether such result would follow if the contract were ambiguous, and susceptible of the construction contended for by plaintiff, we need not decide, because we do not think the language of the contract is ambiguous. It may be stated, however, that the rule is well settled in the national courts that contracts of insurance, like other contracts, should be construed according to the sense and meaning of the terms which the parties have used, and that those terms ought to be taken, understood, and given effect in their plain, ordinary, and popular sense, and that it is only where, because of ambiguity in the language employed, the contract is fairly susceptible of two interpretations— one favorable to the insured, and the other favorable to the insurer—that the rule of liberal construction in favor of the insured may be applied. Liverpool & London & Globe Ins. Co. v. Kearney, 180 U. S. 132, 135, 136, 21 S. Ct. 326, 45 L. Ed. 460; Imperial Fire Ins. Co. v. Coos County, 151 U. S. 452, 462, 463, 14 S. Ct. 379, 38 L. Ed. 231; New Amsterdam Casualty Co. v. Central National Fire Ins. Co. (C. C. A. 8) 4 F.(2d) 203, 207, 208, 209; Hawkeye Commercial Men's Ass'n v. Christy (C. C. A. 8) 294 F. 208, 211, 40 A. L. R. 46; United States F. & G. Co. v. Centropolis Bank of Kansas City, Missouri (opinion filed February 9, 1927) 17 F.(2d) 913.

It may require careful reading to ascertain the meaning of the partial suspension clause; but, when it is carefully read, the meaning is clear and plain. The clause is susceptible of no interpretation other than the one we have given to it. The case of Nusbaum v. Hartford Fire Ins. Co., 276 Pa. 526, 120 A. 481, is not in point. There the provisions of the policy used the language "proportion of," without clearly or expressly stating proportion of what. The court applied the rule of strict construction against the insurance company, and held that it was liable for the actual amount of partial suspension loss up to the maximum per diem liability for a total suspension loss fixed in the policy. Here the policy clearly states the liability for partial suspension shall be "that proportion of the per diem liability that would have been incurred by a total suspension of business," which is, under the policy, $33.33.

The decree is therefore reversed, and the cause remanded, with instructions to enter a decree denying reformation of the contract and retransferring the cause to the law docket for a new trial as an action at law.