MARYLAND CASUALTY CO. et al. v. UNITED STATES for Use of GREEN et al.

No. 13640.

Circuit Court of Appeals, Eighth Circuit.
Aug. 3, 1948.

---

Roman L. Hruska, of Omaha, Neb. (Raymond M. Crossman, John L. Barton, Ralph M. West, Richard E. Robinson, and Edward G. Garvey, all of Omaha, Neb., on the brief), for appellants.

Francis S. Gaines, of Omaha, Neb. (Edward J. Shoemaker and Bryce Crawford, Jr., both of Omaha, Neb., on the brief), for appellees.

Before SANBORN, THOMAS, and RIDDICK, Circuit Judges.

RIDDICK, Circuit Judge.

This is an appeal from a judgment on a directed jury verdict in an action under the Act of August 24, 1935, 40 U.S.C.A. § 270a and 270b, brought by the appellees against the appellants to recover for labor done in the construction of an Army airbase near Ainsworth, Nebraska. Appellees, sub-contractors on the project, are Ralph Green and William L. Groesbeck. Appellants are J. W. and N. L. Terteling, comprising the partnership of J. A. Terteling & Sons, contractors with the United States for the work at the airbase; and the Maryland Casualty Company, surety on the payment bond given by J. A. Terteling & Sons to the United States as required by the Act.

### The Pleadings

In their complaint the appellees alleged that the Tertelings were indebted to them for work done, in the construction of the airbase, under the following contract:

"We, Ralph Green and W. L. Groesbeck propose to and will do necessary excavation, compaction and rough grading necessary for the addition to the existing apron now at the Ainsworth Army Airbase, Ainsworth, Nebraska. We agree to furnish all necessary equipment and incidentals thereto and personnel for the supervision and execution thereof.

"Said excavation and compaction shall be started on or before May 8, 1943, and shall be prosecuted diligently until its completion.

"This work shall be paid for at the unit price of thirty-nine and six-tenths cents (39.6) per cubic yard as according to the Engineers estimates.

"With regard to the compacted sub-base, which we will call the top nine (9″) inches of the sub-grade, it shall be paid for as a sub-base at the rate of seventy-two (72¢) cents per cubic yard as according to the Engineers estimates.

"This proposal made by us on the 6th day of May, 1943.

"Ralph Green & W. L. Groesbeck.
"By L. A. Briggs

"Accepted this 7 day of May, 1943 by J. A. Terteling & Sons. By Roy M. King."

They asked for judgment against the Maryland Casualty Company, surety on the Tertelings' payment bond. On motion of the Casualty Company the Tertelings were made parties defendant.

The Tertelings and the Casualty Company filed separate but identical answers, admitting the execution of the contract sued on and the full performance of the work called for by it, but denying that it constituted or was intended to constitute the real agreement between the parties. They allege that the fourth paragraph of the contract sued on was intended to mean and did mean to all parties concerned to apply only to such portions of the sub-base of the project under construction as consisted of "select material" as defined by the Tertelings' contract with the United States and the specifications forming a part of that contract; that by mutual mistake or mistake accompanied by inequitable conduct on the part of appellees, the contract failed expressly to refer to such "select material," although such was the intent, meaning, and purpose of both parties.

Appellants charged that at the time the contract sued on was reduced to writing and signed by the parties, it was agreed between them that "the terms and conditions defining the scope of work to be done, and the respective rights and obligations of the parties thereto, would be reduced to proper written form," and that this formal contract when written would embrace all work which appellees agreed to do under the contract sued on; that pursuant to this understanding between the parties the Tertelings prepared a formal contract, copy of which was made a part of the answers, and, after the execution of the contract sued on, submitted the formal contract to appellees for signature, and that thereupon it became and was the real contract between the parties.

By way of affirmative relief appellants asked the decree of the District Court reforming the contract sued on and establishing the formal contract prepared by the Tertelings as the contract between the parties. The grounds for this relief, as indicated above, were the alleged mutual mistake in the execution of the contract sued on, or mistake accompanied by inequitable conduct on the part of appellees estopping the appellees from denying that the later

formal contract was the real contract between the parties. The alleged inequitable acts of appellees were representations by them to the Tertelings that the language of the fourth paragraph of the contract sued on was intended to mean that the 72 cents a cubic yard rate for the 9 inch sub-base was to apply only in the event "select material" was used in its construction; conduct of appellees inducing appellants to believe that the formal contract was the real contract between the parties, this conduct being the retention by appellees of the formal contract without signing it or returning it or expressing any objections to its terms or provisions, the acceptance by appellees of partial payments during the progress of the work, alleged to have been computed and based on the terms of the formal contract, the failure of appellees to present to the Tertelings objections to the final estimate for work done, or to make known to the Tertelings any objection to the estimate of work done until after the Tertelings had made a final settlement with the United States. And, throughout the trial, the appellants insisted that the contract sued on was ambiguous; that extrinsic evidence was admissible to explain the phrase "as according to the Engineers estimates" as used in the contract; and that evidence offered by appellants to explain the phrase compelled the interpretation that the 72 cents unit price specified for the 9 inch sub-base was payable to appellees only on the condition that the sub-base was constructed of "select material."

In a reply filed by leave of court appellees alleged that they were bound by the terms and specifications of the Tertelings' contract with the United States only so far as those terms and specifications pertained to the particular work called for by the contract sued on. All other averments of the answers were denied.

### The Evidence

At the time the negotiations which resulted in the contract sued on began the Tertelings were completing their work under a contract with the United States for the construction of concrete aprons, taxiways, and drainage at the Ainsworth Airbase. The work was in charge of Army engineers who had announced a proposal to extend the facilities under construction and had notified the Tertelings that a contract for the extensions would be awarded to them on the terms and specifications stated in the contract for the work then nearing completion. At some time in the past the appellees had done some of the grading and base compaction at this airbase and had available the machinery required for the same work on the proposed extensions.

Speed in the completion of the new work was of first importance. The Army engineers suggested to the Tertelings and the appellees that the Tertelings employ the appellees as sub-contractors to begin work immediately in preparation of the base for the extended concrete aprons and taxiways.

The negotiations thus initiated produced the contract sued on and its execution before the contract between the United States and the Tertelings for the proposed new work was signed. These negotiations were conducted by Briggs, an employee of appellees, and King, superintendent for the Tertelings in the construction work then in progress. They began with a conference between Briggs and King attended by Jones, another employee of appellees, and Parker, the office manager for the Tertelings. The conference took place in the office of the Tertelings at the construction site.

The contract and specifications for the work then in progress were referred to from time to time during the conference. Both parties knew that under the contract and specifications the sub-grade upon which the extended concrete work was to be laid must be constructed in accordance with the controlling specifications, that is to say that both parties understood that the sub-grade must be built to the elevation provided by the Army engineers, constructed of suitable material, and compacted to the degree of density required by the specifications. In this operation it was necessary to cut down the high spots and to fill in the low spots in the excavated area so as to bring the sub-grade to the required elevation. If the material removed from the elevated portions of the area was not sufficient to bring the low parts of the area to the required grade, the additional material for that purpose was to be taken from borrow

pits. When the excavated and graded area was brought to the required grade in this manner, it was required that it be compacted to a certain degree of density, in this case for the lower part of the sub-grade to a density of 95 per cent and for the top 9 inches of the sub-grade, referred to by the parties as the sub-base, to a density of 100 per cent.

In some cases the character of the soil where work of this character is done is such that the material excavated can be compacted to the required density. In other cases the required density may be obtained only by mixing material brought in from other locations with the local material. In still other cases it is necessary to remove all soil at the scene of the operations and bring in satisfactory material selected from other locations. In the present case the material excavated was of a character suitable for compaction to the required percentage, and it was not necessary to mix it with other material or remove it and substitute in its place material selected in other areas.

The Tertelings' original contract with the United States for the construction of the airbase was dated March 18, 1943, and modifications of that contract for the construction of the additional facilities were dated May 12, 1943, and May 15, 1943. The pay items listed in the contract and modifications are "unclassified excavation" at 44 cents a cubic yard, and "select material for sub-base under pavement and shoulders" at 80 cents a cubic yard.

Nothing in the excerpts from the contract and specifications printed in the record defines "select material", or states the power granted to the Army engineers as final arbiters between the United States and the Tertelings over classification of the material. The specifications, however, provide that the unit price a cubic yard for "unclassified excavation" constitutes full compensation for excavating, hauling, forming, wetting, and compacting the embankment and the disposal of surplus or unsuitable material; that the unit price a cubic yard for "select material for sub-base" shall include payment for furnishing and compacting such material; and that "sub-grade preparation, embankment and compaction" shall not be measured for direct payment.

Performance of such items are to be considered as subsidiary obligations of the contractors under the unit contract price a cubic yard for "unclassified excavation" or "select material for sub-base."

After a full discussion at the conference referred to above, King asked Briggs if his employers would be willing to undertake the sub-grade construction for 90 per cent of the unit prices the Tertelings were receiving under their original contract and would receive under the contract to be executed for the proposed additional work. There is evidence to show that King thought when he made this offer that the Tertelings would receive 44 cents a cubic yard for all proposed new work, except for the construction of the 9 inch sub-base mentioned in the fourth paragraph of the contract sued on, and for that work the Tertelings would receive 80 cents a cubic yard. At the time of the conference the Tertelings had received from the Army engineers estimates of work done under the original contract showing the Tertelings entitled to receive payment for this work at the unit prices stated. Thus, by computation, King's proposal to Briggs was to pay appellees 39.6 cents a cubic yard for all work except that involved in the construction of the 9 inch sub-base, and 72 cents a cubic yard for all the work involved in the construction of these 9 inches. This point in the negotiations was reached about noon. Briggs agreed to submit to appellees for their approval the unit prices suggested by King, and the conference adjourned.

Briggs called Groesbeck, one of the appellees whose headquarters were in Des Moines, Iowa, and submitted to him for his approval the proposed unit prices of 39.6 cents and 72 cents a cubic yard. Groesbeck accepted the proposed unit prices, but demanded that the agreement for them be reduced to writing before beginning work. Later in the afternoon Briggs returned to the Tertelings' office and stated to King that the unit prices suggested by him were acceptable to appellees, but that they required a written agreement concerning them. King then suggested that Briggs prepare a proposal containing the agreement reached at their conference and accepted by Briggs's employers. Briggs re-

plied that he did not know how to prepare such a proposal. Whereupon King offered to dictate it and did so in the presence of Briggs and Parker and with their collaboration. After King's stenographer had read the notes of his dictation and the notes as read had been approved by the parties, they were transcribed in the form shown by the contract sued on. Briggs took the agreement thus reduced to writing, and later that evening or early the next day read it to Groesbeck over the telephone. Groesbeck approved the agreement as written and authorized Briggs to sign it on behalf of appellees. Briggs returned the signed proposal to the office of the Tertelings where acceptance of it was signed on behalf of the Tertelings by King.

At the time the negotiations began, Briggs and King understood that a formal contract would be written embodying the terms of any agreement reached by them and accepted by appellees. The evidence also supports the finding that when the contract sued on was signed, Briggs and King understood that a more formal contract would be prepared for later execution embodying more detailed terms usually employed in such construction contracts. Whether appellees at the time were advised of this understanding between Briggs and King does not appear from anything in the record, nor is there any evidence to show that they ever ratified it.

King accepted the contract sued on for the Tertelings on the 7th day of May, 1943, and appellees promptly began work. Several days later Parker prepared a formal contract and transmitted it by mail to Groesbeck and Green in a letter requesting their acceptance of it. Appellees never accepted this contract and never replied to the letter transmitting it to them. The formal contract contained the usual provisions common to such construction contracts. With one exception none of its provisions was of any importance on any issue in the present case. Many of them were such as are implied in the contract sued on, in view of the circumstances surrounding its execution. The only material provision of the formal contract is the one which changed the unit prices to be paid to the appellees for the 9 inch sub-base. That provision provided for the payment of the unit price specified in the contract sued on only if the sub-base was constructed of "select material."

King testified that on several occasions he asked Briggs why appellees had not signed and returned the formal contract prepared by Parker, and that Briggs gave him evasive answers, promising to call his employers and inquire about the matter and to make a trip to the home office for that purpose. Briggs testified that he advised King on these occasions that the formal contract was not signed because it was not acceptable to appellees. Neither King nor Parker, so far as the evidence reveals, ever asked the appellees themselves why the formal contract was not signed and returned. In these circumstances the work under appellees' contract was completed, appellees receiving partial payments from time to time as the work progressed.

In general, the testimony on behalf of appellants is that in the negotiations resulting in the contract sued on the parties agreed that appellees would receive payment at the unit price of 72 cents a cubic yard for the top 9 inches of the sub-base only in the event appellants received the price of 80 cents a cubic yard for the same work. On behalf of the appellees the testimony is that Briggs insisted upon the unconditional payment of the 72 cents a cubic yard item because of his knowledge, gained from past experience, of the difficulty of obtaining a density of 100 per cent. It further appears that at the time the contract sued on was under negotiation the engineers in charge of the work had allowed the 80 cents item to the Tertelings, but that later they reversed their interpretation of the specifications on this point, on the ground that, since the sub-base was constructed of material excavated for its construction, no "select material" selected and brought in from other localities was used in the work, and for that reason the 80 cents a cubic yard for "select material" was not payable. Since the Tertelings accepted this ruling of the Army engineers as correct and binding on them, we may suppose that it was. Appellants, however, do not deny that appellees performed the work called for in the contract sued on according to the specifica-

tions governing appellants' contract with the United States so far as those specifications were applicable to the contract sued on; that is to say, they make no contention that the sub-grade and sub-base were not constructed to the required grade, or were not compacted to the required density, or were not constructed of suitable material What they seek to do is to add to the fourth paragraph of the contract sued on terms and conditions not incorporated in it, and to accomplish this addition either in the guise of interpretation of an alleged ambiguity in the contract or by way of reformation because of an alleged mutual mistake or mistake induced by inequitable conduct on the part of appellees. We agree with the District Court that the evidence in the record does not permit this result.

## The Contract Sued On Is Not Ambiguous

 We are unable to find the ambiguity the appellants profess to see in the contract sued on. It is, as the District Court declared, a short and simple statement by which the Tertelings employed the appellees, for agreed unit prices, to do the excavation, grading, and compaction necessary for the proposed addition to the facilities of the Ainsworth Airbase. The plainly expressed obligation of the appellants is to pay the appellees 39.6 cents a cubic yard for all of the excavation, grading, and compaction, except for that part of these operations required in the construction of the top 9 inches of the sub-grade. For this top 9 inches the appellants were to pay the appellees the stipulated price of 72 cents a cubic yard for all the excavation, grading, and compaction necessary to its construction. It was not necessary to clarity or certainty of the contract sued on that it state the number of cubic yards to be excavated, graded, and compacted in the lower portion of the sub-grade or the number of cubic yards to be excavated, graded, and compacted in the top 9 inches of the sub-grade. The contract provides that the quantities in both operations were to be determined by the measurements of the Army engineers in charge of the work. Other provisions usual in such contracts may have been advisable, but were not necessary to make the contract sued on a complete contract. From the circumstances surrounding its execution there was implied in the contract as written the requirement that the work should be done in conformity with the specifications provided in the contract between appellants and the United States so far as applicable, and it is not denied that the work was so performed.

 "The test of the completeness of a written contract is the writing itself, and parol evidence to show that it is incomplete is not competent." Dawson County State Bank v. Durland, 114 Neb. 605, 209 N.W. 243, 245. "And when the writing itself upon its face is couched in such terms as import a complete legal obligation, without any uncertainty as to the object or extent of the engagement, it is conclusively presumed that the whole engagement of the parties, and the extent and manner of their undertaking, was reduced to writing." Silence on a point which might have been embodied in it does not open the door to parol evidence in that regard. Seitz v. Brewers' Refrigerating Machine Company, 141 U.S. 510, 517, 12 S.Ct. 46, 48, 35 L.Ed. 837; Chicago, R. I. & P. R. Co. v. Maryland Casualty Co., 8 Cir., 75 F.2d 596, 599, 600. "When a contract, complete in itself, fails to incorporate a previous oral agreement, then it must be presumed that the parties have purposely rejected the earlier oral agreement." E. J. Albrecht Co. v. New Amsterdam Casualty Co. et al., 7 Cir., 163 F.2d 16, 19. No rule concerning the interpretation of contracts is more firmly established than that which excludes the testimony of a party to a written contract that he intended to express a meaning contrary to that which the law imposes upon the language of the contract. Eustis Mining Co. v. Beer, Sondheimer & Co., Inc., D.C., 239 F. 976. "The court may not inquire into the secret or unexpressed intention of one or both of the parties." Chicago, R. I., & P. Ry. Co. v. Maryland Casualty Co., supra, 75 F.2d at page 600. In the Eustis Mining Company case, frequently cited by the courts, defendant offered in evidence a written contract which the plaintiff had submitted to defendant for signature after the execution of the contract sued on, but which defendant refused to sign, as evidence showing plaintiff's interpretation

of the contract sued on. In holding the contract inadmissible for the purpose offered, Judge L. Hand said in 239 F. at pages 984, 985:

"It makes not the least difference whether a promisor actually intends that meaning which the law will impose upon his words. * * * Hence it follows that no declaration of the promisor as to his meaning when he used the words is of the slightest relevancy * * *. Indeed, if both parties severally declared that their meaning had been other than the natural meaning, and each declaration was similar, it would be irrelevant, saving some mutual agreement between them to that effect."

 The fact that the parties agreed upon the later execution of a more formal and detailed contract does not permit the reception of evidence inconsistent with the terms of the contract which they have written. 3 Williston on Contracts, Rev., 1936 Ed., § 633. Neither the formal contract offered in evidence by the defendant, nor the proof of prior negotiations of the parties leading up to the signing of the contract sued on was receivable in evidence to establish an intention of the parties contrary to that expressed in the writing itself.

 Appellants contend vigorously, however, that evidence was admissible to explain the phrase "as according to the Engineers estimates" as used in the contract sued on, on the ground that the language in question has an established and accepted meaning in the construction trade. The court declined to receive the testimony of an expert witness introduced by appellants to testify to the trade meaning of the language in question. Evidence of the character offered is receivable in a proper case. But the court committed no prejudicial error in refusing to receive the proffered testimony in the present case, because appellants had elicited exactly the same testimony from appellees' expert witness. The testimony of both witnesses was that the language in question was used in the construction trade to confer upon the engineer in charge of the work the right to determine both the quantity of the work done and the classification of the materials used in it; and such, we may assume, is the meaning of the language in question as used in the contract sued on when taken in its plain, ordinary, and popular sense. Appellants offered the evidence to show that under the specifications governing the Tertelings' contract with the United States the engineer's determination as to what material was to be classified as "select material" is binding on the parties to that contract. Assuming that to be so, the evidence has no relevancy in the interpretation of the contract sued on, since that contract contains no provision for the use of "select material" in any of the work which appellees agreed to do. The language in question is to be read in its context. Proof of its accepted trade meaning in another context can not be made the vehicle for bringing into the contract sued on terms and conditions the parties have deliberately refused to place in it. Nothing in the record calls for departure from the rule that the interpretation of a contract is for the court.

## Reformation

 "The province of reformation is to make a writing express the bargain which the parties desired to put in writing. * * * if, because of mistake as to an antecedent or existing situation, the parties make a written instrument which they might not have made, except for the mistake, the court cannot reform the writing into one which it thinks they would have made, but in fact never agreed to make." 5 Williston on Contracts, Rev., 1936 Ed., § 1549. "To justify reformation on the ground of mistake, the mistake must have been made in the drawing of the instrument and not in the making of the contract which it evidences. * * * A mistake as to the existing situation, which leads either one or both of the parties to enter into a contract which they would not have entered into had they been apprised of the actual facts, would not justify reformation. It is not what the parties would have intended if they had known better, but what they did intend at the time, informed as they were." Russell v. Shell Petroleum Corporation, 10 Cir., 66 F.2d 864, 867; Rock-Ola Mfg. Co. et al. v. Filben Mfg. Co. et al., 8 Cir., 168 F.2d 919. "The party alleging the mistake must show exactly in what it consists and

the correction that should be made. The evidence must be such as to leave no reasonable doubt upon the mind of the court as to either of these points. The mistake must be mutual and common to both parties to the instrument. It must appear that both have done what neither intended." Moffett, Hodgkins & Clarke Co. v. Rochester, 178 U.S. 373, 385, 20 S.Ct. 957, 961, 44 L.Ed. 1108. The burden of proof rests upon the complainant and, to sustain it, evidence that is plain and convincing beyond reasonable controversy is required. A mere preponderance of the evidence is not sufficient. Bailey v. Lisle Mfg. Co., 8 Cir., 238 F. 257, 266; Southern Surety Co. v. United States Cast Iron Pipe & Foundry Co., 8 Cir., 13 F.2d 833, 837; International Harvester Co. v. Mississippi Land Co., 8 Cir., 43 F.2d 17, 22; Firemen's Insurance Co. v. Lasker, 8 Cir., 18 F.2d 375; Paine–Fishburn Granite Co. v. Reynoldson, 115 Neb. 520, 213 N.W. 750; Smith v. United States Fidelity & Guaranty Co., 142 Neb. 321, 6 N.W.2d 81; Beideck v. National Fire Ins. Co., 139 Neb. 171, 296 N.W. 873; Herzberg's Inc. v. Ocean Accident & Guarantee Corporation, Ltd., 8 Cir., 132 F.2d 438; Philippine Sugar Estates Development Co., Ltd., v. Philippine Islands, 247 U.S. 385, 391, 38 S.Ct. 513, 62 L.Ed. 1177.

 The evidence relied on by appellants in support of their claim for reformation falls far short of the requirements stated in the above authorities. At most, it tends to show the mistaken belief on the part of King and Parker that appellants would receive payment from the United States at the rate of 80 cents a cubic yard for the construction of the 9 inch sub-base, although "select material," as ultimately defined by the engineers in charge of the work, was not required in its construction. Even if it could be said from the evidence, as certainly it can not, that both King and Briggs entered into the contract sued on in the mistaken belief that the Tertelings would receive 80 cents a cubic yard for the construction of the 9 inch sub-base unconditionally and in all events, the result would be only to show that they were mistaken as to a fact assumed by them to be true. But this would not justify the court under the evidence in the present case in writing for them a contract which clearly they did not write. It is impossible to believe from anything in the record that King and Parker, who were familiar with the contract and specifications under which they had been working for some time, were mistaken in the plain language which they adopted in the agreement between the parties after full and careful discussion and deliberation. The plain and unconditional terms of the contract sued on are in themselves strong support of the testimony of Briggs that he insisted upon payment to appellees of 72 cents a cubic yard for the top 9 inches of the sub-grade unconditionally. The evidence is conclusive that Briggs had no authority to make any contract except the exact contract which the parties signed. Where a contract sought to be reformed is made by an agent of the defendant, the agent's authority to make the contract sought to be substituted must be shown. First National Bank v. Ocean Accident & Guarantee Co., Ltd., D.C., Pa., 294 F. 91, 93. In the face of the fact known to King that appellees demanded a definite unconditional agreement as to unit prices before beginning work and of the known limitations upon the authority of Briggs, it must be accepted as established that the unit prices stated in the contract sued on were final, and payment of them was not subject to any condition not expressed in the contract, and that they were not subject to change at will by either of the parties, and further that any later and more formal contract would be binding upon appellees only when accepted by them.

 We find nothing in the evidence to support appellants' contention that appellees were estopped by their conduct to deny that the formal contract submitted to them by King was the real contract between the parties. "It is a familiar statement of the doctrine of estoppel that one who by his acts or representations, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist, and the latter rightfully acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts, is thereby conclusively estopped to interpose such denial." Dustin Grain Co. v. Mc-

Allister, 8 Cir., 296 F. 611, 615; Nakdimen v. Baker, 8 Cir., 111 F.2d 778.

The indispensable elements of an estoppel are not established by the evidence in this case. Appellants' main reliance is upon the fact that appellees kept the formal contract which King mailed to them without signing it or expressing to the Tertelings their objections to it. But in the circumstances existing at the time the formal contract was sent to appellees, appellants had no right to take the silence of appellees for consent. Having entered into a definite and certain obligation in the contract sued on, appellants had no right to believe from appellees' silence that they agreed to accept in its place a contract which released the appellants from obligations already assumed, and took from the appellees the benefits of the contract which they had demanded before beginning work. The reasonable inference is exactly the opposite.

On this issue appellants attach great importance to a letter written by Groesbeck to Briggs under date of May 13, 1943. The letter advised Briggs that the contract prepared by Parker could not be accepted by appellees because of the objections of appellees to many of its provisions, including its change of the terms of the contract sued on concerning the 9 inch sub-base. Briggs was advised that, if appellants insisted upon a further contract, one could be written in a form acceptable to appellants. The letter concluded with the statement that: "In the event you are unable to handle it (the work) without signing a contract I would have a copy made of our contract, tell them that you might be in a position to execute one on this basis by getting me on the phone, although being sure that I do not have a copy of their contract you sent me." When and how this letter came into the possession of appellants is not shown by the testimony. Since it contained a flat refusal to accept the contract prepared by Parker, it may be assumed that appellants never saw the letter until after the work was completed. Whatever criticism may be advanced concerning the statement quoted from the letter, its importance on the issue of estoppel is not apparent. King and Parker proceeded throughout the work up-on the theory that appellees had received the contract which Parker prepared for them. King's testimony is to the effect that Briggs did not deny that the contract had been received, as the letter suggested. And both King and Parker knew that the contract prepared by Parker had never been signed. Perhaps the explanation of the conduct of both parties is that neither was willing to bring the issue of a new contract to decision. Certainly, the conduct of Parker and King indicates that they were unwilling to meet the issue squarely, by stopping the work unless the formal contract was accepted. Under all the evidence, especially in view of the explicit provisions of the contract sued on, we conclude that this issue was squarely presented to them, and that appellants must abide the consequences of their failure to meet it.

Nor may appellants base estoppel of appellees upon the fact that appellees accepted partial payment of the work during its progress on estimates prepared by the Tertelings and submitted to and accepted by appellees. Appellants' contention is that these estimates were made in accordance with the requirements of the formal contract. But that contract was never accepted by appellees, and there was nothing in the estimates to show that they referred to the so-called formal contract. That they showed no allowance for the use of "select material" was entirely consistent with the terms of the contract sued on, since that contract contained no provision for such an allowance and no requirement for the use of "select material."

In any event, the issues on the question of reformation were before the court upon conflicting evidence. The court's findings of fact, supported as they were by substantial evidence, are conclusive here. Appellants were not entitled as of right to a jury trial on the issue of reformation because of conflicts in the evidence. Suits for reformation were not maintainable at common law. "Traditionally the power to grant such reformation of written instruments has resided exclusively in the courts of equity." Toucey v. New York Life Ins. Co., 8 Cir., 102 F.2d 16, 21, 122 A.L.R. 1415, certiorari denied

307 U.S. 638, 59 S.Ct. 1037, 83 L.Ed. 1519; 3 Moore's Federal Practice, pp. 3008–3010; Federal Rules of Civil Procedure, rules 38, 39, 28 U.S.C.A. following section 723c.

### Other Alleged Errors in Rulings on the Evidence

On objection from appellees the court refused to receive in evidence a letter from appellees to the Tertelings written by Briggs under date of August 6, 1943, asking whether the Tertelings had received final payment on certain items of work done by appellees. The letter was written after the completion of apellees' work and concerned items not involved in this action and which were not in dispute between the parties. The court also excluded three letters written by the Tertelings to appellee after the completion of the work. The first was dated September 2, 1943, and enclosed the Tertelings' final estimate of work done by appellees, together with "Release, Guarantee and Affidavit." Appellees were requested to sign and return the enclosed papers. The second letter dated October 9, 1943, inquired of appellees if the papers enclosed in the letter of September 2 had been received. The third letter dated November 19, 1943 advised the appellees that final settlement had been made by the Tertelings with the United States, and that the Tertelings were now ready to pay appellees according to the estimate of the amount due them enclosed with the letter of September 2, on receipt of the executed "Release, Guarantee and Affidavits." The court also excluded a final partial estimate prepared by the Tertelings and submitted to appellees. The estimate bore no signature or acceptance by appellees. A witness for the Tertelings testified that the estimate had been approved and accepted as correct by Briggs. This testimony was denied by Briggs. The Tertelings were unable to explain the absence of the original signed estimate if there was one. The estimate listed for payment "unclassified excavation" and showed that nothing was payable to appellees for the item "select material."

We find no prejudicial error in the exclusion of any of these exhibits. Presumably they were offered on the issue of estoppel, but it is clear that they have no relevancy on that or any other issue in the case. An inquiry by appellees concerning the payment of certain items not in dispute in this case was not an admission by appellees that there were not other items still unsettled between the parties. The three letters concerning the final estimate, if they prove anything, prove only that appellees refused to accept the estimate as correct or to release the Tertelings from further liability under the contract. The fact that the final partial estimate showed that the appellees had earned nothing for "select material" is of no importance because the appellees' contract did not require them to use "select material", and no claim for "select material" is made in the present action.

### Conclusion

At the close of all the testimony appellants moved the court to direct a verdict in their favor. The motion was denied, and the court on its own motion directed a verdict for appellees.

There was no dispute in the testimony concerning the total number of cubic yards excavated, graded, or compacted by appellees, or concerning the amount paid by the Tertelings to appellees in partial payment of the work done. The court having correctly decided that the contract sued on was the contract between the parties and that the appellants were not entitled to reformation, the determination of the amount due the appellees on the contract was the only issue remaining in the case, and its decision involved only a simple computation. Although the court was correct in directing the verdict for appellees, a plain error was made in the computation of the amount of the verdict. Appellees contended that the amount they were to receive for the work done under the contract sued on was to be computed by multiplying the number of yards graded, excavated, and compacted in the whole operation by the stipulated price of 39.6 cents and by adding to the sum thus obtained a further sum obtained by multiplying the number of cubic yards in the top 9 inches of the sub-grade by the stipulated price of 72 cents a cubic yard. This interpretation of the contract sued on is in direct conflict with its plain provisions. Appellees were entitled to recover on the basis

of 39.6 cents a cubic yard for all excavation, grading, and compaction except that involved in the top 9 inches of the sub-base. For the excavation, grading, and compacting in the top 9 inches appellees were entitled to receive 72 cents a cubic yard. The court made the computation upon the basis contended for by appellees. Since this was clearly a plain and obvious error, the judgment appealed from must be vacated and the case remanded to the District Court with directions to redetermine, in conformity with this opinion, the amount due the appellees, and to enter judgment in their favor for that amount.

Judgment vacated and case remanded.