Booth, Judge,
delivered the opinion of the court:
On May 4, 1921, the Engineering Division of the Air Sendee, U. S. Army, at Dayton, Ohio, issued a circular soliciting the submission of designs and sealed proposals for furnishing the division, among other type,s, a special type of single-seater pursuit airplane, a new type of airplane to be used for the defense of airdromes or home stations, and designated as an “Alert airplane.” The possibility of attaining a plane to meet the situation was indeterminative and the construction of one experimental. Each bidder was expressly required to submit its own design, accompanied by a detailed analysis thereof. Eight airplane manufacturers submitted bids in accordance with the terms of the circular. The plaintiff received the award, and a written contract be *552 tween the parties followed. The plaintiff was originally to receive $90,000 for the work. Subsequently this amount was by mutual assent reduced to $85,000. Plaintiff concedes that all but $18,861.85 of this amount had been paid, and it is for this balance that this ¿suit is brought. Defendant, on the other hand, insists that plaintiff has been overpaid to the extent of $28,696.15, with interest, and an interposed counterclaim is relied upon for a judgment against the plaintiff for this amount.
The contract was dated June 29, 1921, signed July 1, 1921, and required of the plaintiff the manufacture of three Alert airplanes, the weight of each, fully loaded, to not exceed 1,550 pounds. Annexed to and made a part of the contract was specification No. 1541. The contract, and particularly the specifications, enumerated a variety of detail, and the engineers of the Air Service were especially concerned in reserving the right of making changes in plaintiff’s design and construction. There can be no doubt that under the contract and specifications the engineers of the Air Service were in control of the construction work as it progressed. The Government was to furnish the engine at its own expense, and the plaintiff was advised in advance that a Law-rance J-l engine weighing 400 pounds would be supplied.
The plaintiff was obligated first to submit for approval or modification drawings in detail of the power plant, armament, equipment installation, wing section, wind tunnel, and much other data. Prior to any actual work of construction the engineers were to be furnished a “ mock-up,” i. e., a complete model, of its design, with such changes as the engineers might make. The mock-up was subject to inspection, modification, and change. After the mock-up passed inspection, and prior to the authorization of construction work, plaintiff was to submit in minute detail plans and specifications, disclosing with precision the detail of the proposed construction, both as to materials entering into the same and design. No authority for work obtained until all this was accomplished with the approval of the engineers. The first plane completed was to be subjected to test, and jf satisfactory, was to be accepted; if not, it might be changed. *553 If the first plane successfully passed the test, the second and third were to be constructed in accord therewith.
Specification No. 1541 stated that a speed of 145 miles per hour, at an altitude of 15,000 feet and a climb of 20,000 feet in 18 minutes, would be required. Some latitude was allowed the contractor in this respect by Article V of the contract. The Lawrance J-l engine was ,in a stage of experimental development. The engineers did not know its capacity or reliability in high altitudes, so a deviation in speed and altitude was allowed. If the plane at an altitude of 15,000 feet attained a speed of 130 miles an hour, the plaintiff was to suffer a deduction in contract price equivalent to $250 for each mile it fell short of 145, and a like deduction for each minute over 18 required to attain the desired altitude up to the maximum of 25 minutes.
The first plane constructed in accord with the numerous modifications and changes made by the engineers and some made by the plaintiff, the changes made by the engineers increasing the contract price $3,051.70, was delivered to and without flight test, accepted by the engineers and paid for by the Government later on. The plane was given the sand or static test and so far as the record discloses was acceptable.
On January 30, 1923, the engineers required of the plaintiff a .large number of changes in the second and third plane, changes which materially added weight and modified design. The Lawrance J-l engine was 52% pounds heavier than the specifications prescribed. The first plane when delivered weighed empty 1,146.9 pounds; loaded 1,688 pounds. The second plane when delivered weighed empty 1,173.4; loaded 1,715 pounds. The third plane was not weighed, the engineers assuming that its weight was the same as the second, an increase in weight so materially in advance of that anticipated by the contractor in its original design that on December 10, 1921, the plaintiff by letter called the attention of the engineers to this handicap and asked for a material reduction in performance requirements. This request was not immediately denied, but held in abeyance until after the first plane was received. As a' matter of fact it was subsequently refused.
*554 The second plane was delivered June 29, 1928, and the third July 19, 1923. The prolonged delay in the delivery of the plane was due entirely to the defendant’s suggestions and changes and the experimental character of the subject matter of the contract. It is clear from the record that the plaintiff predicated its bid upon a plane of gross flying weight of 1,498 pounds. The defendant was expressly apprised of this fact; and it is equally clear that the changes made in design, construction, and addition of equipage made by the defendant increased the designed weight to the extent of at least 107 pounds.
The test to which the second plane was subjected disclosed that as to speed the plane was not seriously below the desired standard of 145 miles per hour. The chief deficiency observed was in the attainment of altitude within the 18 minutes. In this respect the plane was in default 16 minutes. The plaintiff contends that additional weight retards rapid climbing to an extent disproportionate to its effect in horizontal flying, but that the effect is noticeable in both. There is no doubt that with the improved propeller furnished by the Government the plane did reach the prescribed altitude in 34 minutes. We think the record and the findings warrant a statement that the failure of the second plane to meet the intended purposes of the defendant, both as to speed and altitude, is as much if not more attributable to the defendant as to the plaintiff. We say this because the defendant was not only experimenting with a design but trying out an entirely new and theretofore untried type of engine. The plaintiff had been told that the engine would weigh 400 pounds; that it would develop 200 horsepower at 1,800 revolutions per minute at ground level, and that if the engine did fail in any particular the weight and performance requirements would be modified accordingly. The engine did exceed by 52y2 pounds the stipulated weight. In the test of the second plane its performance was not in all respects satisfactory, and, of course, its perfection was a most vital factor. No modification of requirements was made or allowed. The third plane was rejected without a test on the assumption that it would in all respects accomplish no better results than the second.
*555 The defendant in support of the counterclaim, and in opposition to plaintiff’s contention, rests its case upon the express requirements of the contract, and treats the provisions of the contract relative to speed and altitude as a warranty, or rather guaranty, the failure to attain which authorized the withholding of plaintiff’s pay. Express terms of a contract are always to be considered in the light of the situation of the parties and the intent which actuated them in coming into agreement. There is no ambiguity in the present contract; it is plain from its provisions what the parties wanted and the obligations assumed by each.^’First, the plaintiff was solicited to design and construct an airplane which in flight would attain a fixed minimum of speed and a like minimum of altitude. Such a thing had not been accomplished before, and neither the plaintiff nor defendant knew at the time whether it could be accomplished. It was wholly an experiment, conceded by all parties to be such. The plaintiff submits its design)' in detail; weight is indisputably a vital factor; the defendant, with full knowledge of plaintiff’s conception, and it must be remembered that the plaintiff was an expert in airplane construction, accepts its bid and awards to it the contract. The awarded contract, fully known to both parties, contains a provision empowering the defendant to make changes, modifications, and, of course, suggestions. The plaintiff knew this and executed the contract with this provision in it. What then happens ? The defendant makes a very large number of changes, so many that when the plaintiff’s original design emerges from the contract it is no longer the original conception of the contractor "and reflects in its design and construction as much the embodiment of the defendant’s ideas as the plaintiff’s. While ’the express provisions of the contract authorized changes, it does not. extend the right to the defendant to make such changes as do in the end gender it impossible for the plaintiff to meet the requirements of the' contract. The changes the defendant might make were to be such as to facilitate the attainment of the intended object of the contract and not such as to bring about a breach of its terms. If, then, it is shown that the defendant’s changes, faithfully observed by the plaintiff, not only failed to facilitate the pro *556 duct-ion of an Alert plane but positively stood in the way and prevented the construction of one, assuredly the plaintiff is not to be penalized for doing exactly what he agreed to do; i. e., make an Alert plane in accord with its own design, with such changes as the defendant might suggest to better attain the same purpose.
From this record it is patent, beyond the range of doubt, that the plaintiff was never accorded a fair and full opportunity to demonstrate the possibilities of its own conception of an Alert airplane, or what its own design might do. On the contrary, the final output under the contract was a plane made in accord with the defendant’s notion of how an Alert plane should be constructed; and no complaint is lodged against the detail of construction but one going to performance alone. The case then in our conception of the situation resolves itself into a contract for the designing and construction of a decidedly experimental airplane. The defendant agreed to submit its design and construct accordingly, the defendant reserving the right of cooperation by suggested changes and alterations to procure in the end a plane which by joint efforts would accomplish what the defendant hoped to accomplish. These were dependent covenants, and if it is established that the defendant in fact substituted its own conception of a plane to such an extent as to render it impossible for the plaintiff or the plaintiff and defendant together to produce a plane like the contract called for, surely the plaintiff is not to lose the compensation earned in doing what the defendant ordered it to do. No warranty to do more than was done may apply. The defendant accepted the first plane without a flight test, paid for it in full, and thereby foreclosed a possibility of challenging the plaintiff’s contract right to the stipulated price. The second and third plane did not correspond in detail of construction or weight with the first plane, because of the numerous changes made by the defendant in the second and third plane. If the first plane was acceptable, it is manifest from the subsequent, conduct of the defendant that a program was to be adopted along the lines of the defendant’s plans as to the second and third planes to discover if possible what might be done under circumstances meeting every con *557 tingency to which a plane of this character might be subjected in action.
The case we think falls under the principles announced in the cases cited in plaintiff’s brief, viz: MacKnight Flintic Stone Co. v. New York, 160 N. Y. 72; Filbert v. Philadelphia, 181 Pa. 530; Spearin v. United States, 248 U. S. 132. The cited cases sustain the rule that where a contractor is denied his own independent judgment as to the preparation and sufficiency of his own plans and specifications for the construction of prescribed structures by a provision in the contract which imposes upon him the duty of following the plans and specifications of the owner', and he does in a' workmanlike manner follow such plans, he is not to be denied compensation therefor because it finally develops that the work done in accord with said plans does not develop the intended results. In this case we can not escape the conclusion that neither party to this contract intended that the contractor would expressly warrant a specific result, when the attainment of the end was not left by the contract to the contractor’s judgment or plans, but was dependent upon a future contingency which the contractor had no means of anticipating or accurately ascertaining. The third plane was not tested but arbitrarily rejected without test or trial.
Judgment for the plaintiff for.$18,361.55. It is so ordered.
Moss, Judge/ Gkaham, Judge; and Campbell., Chief Justice, concur'-.