**NATIONAL PRESTO INDUSTRIES, INC.**

v.

**The UNITED STATES.**

No. 370-58.

United States Court of Claims.
Oct. 16, 1964.

Whitaker, Senior Judge, dissented.

Robert E. Sher, Washington, D. C., for plaintiff. Isadore G. Alk, Abraham J. Harris, James H. Heller, Washington, D. C., and Maslon, Kaplan, Edelman, Joseph & Borman, Minneapolis, Minn., of counsel.

David Orlikoff, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before JONES and WHITAKER, Senior Judges, and LARAMORE, DURFEE, and DAVIS, Judges.

DAVIS, Judge.

 Toward the close of the Korean hostilities, in the late fall of 1952, the Ordnance Department of the Army sought proposals for the commercial production of 105-millimeter artillery shells. Along with other firms, plaintiff, a fabricator of pressure cookers which had turned to the manufacture of cartridge cases and shells during and after World War II, submitted a plan for the production of the shells (at its plant at Eau Claire, Wisconsin) by the conventional hot forge method—involving considerable heat twice applied, and two turning steps at which large amounts of excess steel are removed from the shell. While the proposals were under consideration, Ordnance mulled over a change in the procurement from the conventional method to the new hot cup-cold draw process. The central advantage of this mode is that the steel is heated only once and there is much less excess metal to be removed. The plaintiff already had an Ordnance contract for making 105-millimeter shells by the older method at its factory at Menom-

onie, Wisconsin, and its initial response to the Army's suggestion of a further contract was based on that system. However, plaintiff then considered conforming its proposal for Eau Claire manufacture to the newer process. In June 1953 the parties entered into two letter contracts, one for establishing lines to produce shells at Eau Claire and the other for the production there of one million 105-mm. shells. It was shortly agreed that the Eau Claire plant was to use the hot cup-cold draw method. After production of the shells immediately needed, the plant was to be retained in stand-by condition for the Army's use.

Under these letter contracts, which were preliminary to formal agreements, the plaintiff was to propose the equipment (and facilities) it believed to be needed for production. The defendant was to pay for the items upon which agreement was reached; in that sense the equipment was to be government-furnished property. Some months were consumed in plaintiff's preparation of its proposed equipment-schedule, and of a suggested fixed-price for making the shells by the new method. There were some tentative discussions. On November 10, 1953, the parties met to consider the final schedule to be incorporated in the formal facilities contract which would supersede the letter contract on facilities. Of concern to us was the discussion of the need for plunge grinders—devices mainly used to remove surface imperfections in steel. Plaintiff felt that the six new shell lines at Eau Claire should include 24 plunge grinders, four to each line. Ordnance thought them unnecessary; its principal representative informed plaintiff that he would not approve a facilities schedule which included plunge grinders; he also said that, if the grinders proved necessary in the course of performance, he would sanction their acquisition.[1] The plaintiff

---

1. Plaintiff insists that Colonel Haskell, the chief Ordnance representative, went further and declared that the Army would be responsible for the consequences of omitting the plunge grinders. One of plain-

tiff's witnesses testified to that effect and produced an internal memorandum for plaintiff's own files in which he had put down, on the day after the conference, that understanding of the Colonel's posi-

thereupon submitted its new price and a schedule omitting the grinders; that equipment was not included in the formal contracts which were executed in early December 1953. Production of the shells was to commence, after installation of the facilities yet to be acquired, in July 1954.

Plaintiff then began the detailed process leading to the acquisition and installation of the necessary equipment. In March 1954, before completion of the contractor's engineering studies and its placement of orders, the defendant told plaintiff that it was drastically curtailing its procurement of 105-mm. shells and that both plaintiff's Eau Claire and Menomonie contracts were terminated for all production scheduled for delivery after April 30, 1954. Following negotiations for a decrease rather than elimination of production, the defendant rescinded its notice of termination of the Eau Claire contract and, on June 30, 1954, the parties entered into a supplemental agreement (to that contract) providing that plaintiff should produce a new total of 1,100,000 105-mm. shells (in place of the former totals of the shells to be made at Menomonie and at Eau Claire), at a fixed price of $5.2499 per shell, to be manufactured at either plant as plaintiff wished. Production at Menomonie would follow the conventional hot forge method while the new hot cup-cold draw system would be used at Eau Claire.

Because the Menomonie plant was already operational, plaintiff began to supply the new total of 1,100,000 shells from that factory. By the end of August 1955, over 800,000 shells had been shipped from there. Since preliminary operations at Eau Claire did not begin until the summer of 1955, it appeared that the full quota of shells would be produced at Menomonie by the conventional process before the new method could be fairly sampled at Eau Claire. The Government was anxious to test the hot cup-cold draw system. Early in September 1955, the parties agreed that the conventional operations should be reduced so that some 180,000 shells would be left to be manufactured (by March 1956) under the new process.

Plaintiff suffered difficulties of various kinds in making the hot cup-cold draw system fully functional at Eau Claire. Only one of these problems is now alleged to be the defendant's responsibility —the need for turning equipment to shave excess metal. The first batch of shells, produced relatively slowly and using only one of the six lines at Eau Claire, did not require any such turning. But as production increased there, in the fall of 1955, it became doubtful that good shells could be made without a turning step; the shells were not concentric when they came out of the hot forge and some shaving (but still less than in the conventional method) was necessary. A final decision on this point was put off until April 1956 when it was decided by the parties to purchase a number of new lathes for this purpose (plunge grinders were never considered). Meanwhile, plaintiff, with the consent of Ordnance, transferred some older lathes from the Menomonie plant to perform this turning function. The remainder of the contract shells were produced at Eau Claire, using these Me-

tion. A witness for the defendant, who had been present at the meeting, flatly denied that any such statement had been made. Colonel Haskell was in Europe and unavailable for the trial. The Trial Commissioner, who heard the witnesses, made no finding, one way or the other, on this point; he admitted some reluctance to make a finding on the basis of the sharply disputed oral testimony and in the absence of any written record, accepted by both parties, of the conference. We have reviewed the evidence on the issue and do not feel justified in concluding from the cold record that plaintiff has borne its burden of showing that such a promise was made by Colonel Haskell. The oral testimony is in square conflict, and in the absence of a finding of credibility by the Commissioner we have no reason to prefer one version over another. The plaintiff's internal memorandum cannot be controlling.

nomonie lathes. Production of the 180,-000 shells to be made by the hot cup-cold draw process was not completed until September 1956. The defendant paid for the additional equipment and also remitted the full contract price. Nevertheless, plaintiff lost considerably over $700,000 on its production at Eau Claire. It attributes some $743,000.00 of this loss to the lack of turning equipment, timely furnished and adequate; plaintiff's claim is that it expended large sums (on labor, overhead, and materials) in trying for a long time to produce the shells without turning, and thereafter in using the Menomonie lathes. These expenses plaintiff charges directly to defendant's refusal to include plunge grinders in the original schedule of equipment and facilities.

I

The case has been wholly tried in this court[2] and we must decide whether the Government should assume all (or part) of the loss plaintiff incurred or whether that loss must stay with the contractor which has thus far shouldered it. The first subdivision of the claim is that the defendant broke its contractual obligation by refusing to authorize the acquisition and use of turning equipment at the outset of the contract. The theory is that, since the Government was to furnish the facilities for the production lines at Eau Claire, it was required to supply adequate devices to make the 105-mm. shells by the new hot cup-cold draw method. By omitting the plunge grinders (requested by the plaintiff) from the equipment to be furnished, the defendant (it is urged) breached an express and an implied warranty of adequacy, and also wrongly imposed its own mistaken judgment on the plaintiff. It is of no consequence, on this view, that the contractor initially proposed plunge grinders and later recommended and used lathes. The grinders were sought, it is said, because plaintiff foresaw from the beginning that it would still be necessary, even under the new process, to remove steel from the shells through use of some sort of turning equipment; the lathes which were actually utilized performed exactly that function.

On this phase of the case, we can assume, without deciding, that the defendant would be liable under the contract if the parties had left the specification of the government-paid-for equipment to be determined after the contract was made, and the defendant had then refused to authorize a tool or device which was needed to manufacture the shells in due time. We can also assume, likewise without deciding, that the request for plunge grinders equaled one for lathes.

2. Plaintiff did not seek relief from the contracting officer or the Board of Contract Appeals, and there is no administrative record on the factual issues in the case. At the trial before our Commissioner, both parties introduced evidence; neither objected to the use of *de novo* evidence, sought a stay so that disputed issues of fact could be determined administratively, or raised the point that administrative proceedings should have been had. After the Commissioner's report had been submitted and the plaintiff had filed its brief and exceptions, defendant moved for the first time to suspend the proceedings so that the plaintiff could present any disputed questions of fact to the contracting officer and to the Armed Services Board of Contract Appeals. Plaintiff opposed on the ground, among others, that this is an action for unliquidated damages for breach of contract, to which United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963), is wholly inapplicable. The motion was denied by a single judge. Considering the point as raised anew in the course of the presentation of the case on the merits, we deny it, again, on the ground that defendant waived any right it may have had to an administrative determination of the facts by failing to make the point until too late a stage in the proceedings. Commerce Int'l Co., Inc. v. United States, Ct.Cl., 338 F.2d 81, decided this day; Wingate Constr. Co. v. United States, Ct.Cl., No. 394–60, decided Jan. 24, 1964, slip op., p. 7; WPC Enterprises Inc. v. United States, Ct.Cl., 323 F.2d 874–878, decided Oct. 11, 1963; Stein Bros. Mfg. Co. v. United States, Ct.Cl., 337 F.2d 861–863, decided July 12, 1963.

■ The hurdle we cannot overcome is that in this case the discussion and decision on turning equipment (*i. e.*, plunge grinders) all took place before the parties were legally bound. When the plaintiff proposed, and the defendant rejected, the inclusion of grinders in the schedule of equipment to be financed by the Government for the production of the shells, the parties were acting under two temporary letter contracts— one for the supply of the shells and one for the facilities and equipment. These were preliminary contracts contemplating agreement upon, and execution of, two formal contracts (supply and facilities) before substantial production was to be started. But the letter contracts also envisaged that the parties might not be able to concur in the terms of the formal agreements; both letters provided that if agreement could not be reached on the formal contracts within 120 days from the date of the letter contracts (June 4, 1953), or a further date which was mutually agreeable, the letter contracts would terminate and the plaintiff would be paid for its expenditures-to-date-of-termination under the termination clauses incorporated in those documents. It is also quite clear from the letter contract on facilities that the parties had not yet come together on any specific items; the only agreements in that area were the general ones that "facilities shall be capable of producing a quantity of 360,000 shell on a one (1) shift, eight (8) hour, five (5) day week basis," [3] and that the standard-form Ordnance contract for facilities would be used. Obviously, the plaintiff was to prepare and proffer a list of items which would, if agreeable to the defendant, be incorporated in the formal contract. The plaintiff, not the Government, was to be the source and initiator of the suggestions. Its actions under the letter contracts show that it thoroughly understood this procedure.

When Ordnance and the plaintiff discussed, in the fall of 1953, the inclusion of plunge grinders, the letter contracts were still extant (they had been extended to December 4th) and formal contracts had not yet been consummated. One of the prime reasons for the meetings was to decide, if possible, what equipment and facilities should be covered by the formal facilities contract. On this record there is no reason to doubt that the parties discussed the matter of plunge grinders in utmost good faith. The hot cup-cold draw process was new and the defendant's expertise was certainly no greater than the plaintiff's (and probably less); there were no decisive indications that the questioned equipment should or should not be included; at most the choice lay in the area of legitimate doubt. Both parties had the full legal right to stand on their positions and thus to end the negotiations. The contractor was free to insist on plunge grinders (or other turning equipment) and the defendant was equally free to maintain that they should not be listed. In the event of an impasse the whole project would be terminated and plaintiff would receive its costs to date.

Plaintiff did not take this road. Instead, it acquiesced in the Ordnance position and presented a schedule omitting plunge grinders and proposing a new fixed-price. This written presentation did not refer to the grinders (or comparable machines) or intimate any concern over their absence. The plaintiff simply withdrew from its former position. Similarly, the formal contract did not list or refer to this (or like) equipment and did not even embody Ordnance's oral promise that it would authorize the purchase of the grinders if

---

3. Plaintiff sees this general clause as a guarantee by the Government that, whatever the facilities subsequently incorporated in the final contract, the contractor would be able to perform effectively. We read the clause as a general indication to plaintiff to propose facilities designed to achieve that goal, and in no sense as a warranty by the *defendant* as to the adequacy of the facilities (as yet undecided) for which it would ultimately pay.

their use was shown to be necessary during performance.[4] The formal facilities contract said, quite precisely, that the Government desired to provide the property *listed in the schedules* to the contractor "for use in the production of 105 MM, M1 Shell by a combination hot forge and cold draw process at the rate of 360,000 per month on a one-shift, eight-hour five-day week basis." Only the specified items were to be provided; there was no undertaking at all as to any other pieces of equipment.

In these circumstances we cannot find any warranty or representation by the Government, express or implied, as to plunge grinders or turning equipment.[5] Before the contract was made, the plaintiff understood that the defendant, for better or worse, would not then countenance the acquisition of these items. Nevertheless the plaintiff went ahead to complete and execute the bargain. The situation was not materially different from pre-contract negotiations in which the participants haggle over equipment to be financed or furnished by the Government for a new procurement. In the absence of overriding special knowledge on the part of the defendant (cf. Helene Curtis Industries, Inc. v. United States, Ct.Cl., 312 F.2d 774, decided Feb. 6, 1963) or some explicit clause later inserted in the contract, the defendant's refusal to agree to the plaintiff's introductory request is not a warranty or a representation that the contract can be effectively performed on the Government's terms, any more than the defendant's insistence in negotiation on a certain price is a warranty or representation that the contractor will be able to make a profit at that price. Negotiation still involves bargaining, and the would-be contractor's concession to a Government position is not transmuted into reliance-on-a-representation every time the contractor guessed wrongly in making the concession.[6] On the plaintiff's argument, the full risk will always rest on the defendant—even though the parties do not consciously agree to put it there and the Government's knowledge is no greater than the contractor's. If the disputed equipment turns out to be unneeded but the contracting officer has acceded to the contractor's demand, the Government will expend its funds for no purpose and normally without any recourse against the contractor; if, however, the Government refuses and the item then proves unnecessary, no harm comes to the contractor. On the other hand, where the equipment is actually required, plaintiff would make the Government always bear the resulting costs, either under the contract if it concedes the contractor's

4. In contrast, the formal supply contract included a caveat, which the parties had earlier discussed, as to the price of steel.

5. We have already indicated, supra, fn. 1, that the evidence does not support the contention that there was a specific oral warranty.

6. Where the Government orders an item to be manufactured, or a structure built, according to certain specifications, it will usually be held, nothing else appearing, that the defendant implicitly represented that, if the specifications were complied with, satisfactory performance would result. See, e. g., R. M. Hollingshead Corp. v. United States, 111 F.Supp. 285, 124 Ct.Cl. 681 (1953). This rule rests on the presumed expertise of the Government where it sees fit to prescribe detailed specifications. But this court has also pointed out that "if the manufacturer knows, or, perhaps, from his experience should know, that the desired article cannot be made from the specified materials, he has no right to make a useless thing and charge the customer for it." Ibid., 111 F.Supp. at 286, 124 Ct.Cl. at 683. Even for Government specifications, the rule may be different where the defendant has no special knowledge of the process of manufacture and the subject is brought into the open before the contract is made. Cf. Beacon Constr. Co. v. United States, Ct.Cl., 314 F.2d 501, decided March 6, 1963, and WPC Enterprises, Inc. v. United States, Ct.Cl., 323 F.2d 874, 876–877, decided Oct. 11, 1963. In any event, the government-specification rule has no application where, as here, the contractor is the source of the proposal, and the defendant's role is merely to approve or disapprove.

request or in court if it refuses. Unless the parties have affirmatively done so, such a one-sided post-contract assignment of risks disclosed before final agreement is foreclosed by the theory of the fixed-price contract.[7] The entire burden cannot thus be cast on the Government.

The result is no different if we reject plaintiff's version and assume that the discussion of plunge grinders had nothing to do with the need for the lathe-like turning equipment which was ultimately revealed. In that event the parties would have entered into the formal agreements without bringing into the open the question of turning equipment. But, for the reasons given above, the defendant would still not have warranted or guaranteed the adequacy of the items of equipment on which agreement was reached. There were no express warranties. The Government did not prepare the list, have the greater knowledge, or make the studies. The process was novel. Accordingly, the Government's representatives were in no position to, and did not, assure plaintiff that the list plaintiff proposed would be sufficient. There may have been a mutual mistake, but there was no undertaking, explicit or implied, by defendant to assume all the risks that the agreed-upon items would effectively produce the shells.

The principles and decisions on which plaintiff relies are inapposite. In Ekco Products Co. v. United States, Ct.Cl., 312 F.2d 768, decided Jan. 11, 1963, the court held that, since the formal contract specified that head turners were to be furnished by the Government, adequate machines were impliedly warranted under the usual rules of bailment. There were no pre-contract negotiations negativing such an implied warranty; in addition, the court expressly held that because of the protective coating on the machines the contractor's inspection, made before the contract was executed, enabled its representatives to determine very little, if anything, about the turners (312 F.2d p. 773). Ekco deals with property furnished by the Government to a contractor; the decision does not treat with a claim of implied warranty where the disputed equipment was omitted from the final contract and the parties' negotiations fail to suggest any promise by the defendant to guarantee performance. Dayton-Wright Co. v. United States, 64 Ct.Cl. 544 (1928), is likewise far afield. The suit was not for damages over and above the contract price but solely for the contract price; recovery was allowed because the defendant, *after* the contract was made on the basis of the contractor's own design and specifications, so changed the conception embodied in the contract that it was impossible for the plaintiff to meet the performance requirements. The present case differs sharply, among other things, in that the "imposition of defendant's mistaken judgment"—of which plaintiff now complains but in which it originally acquiesced—occurred prior to the making of the contract, not after.

## II

Having rejected plaintiff's claim of a breach of contract, we come, now, to the more difficult phase of the case—can there be any sort of recovery here, premised on a mutual mistake? Except where the parties have failed to conform the written instrument to their actual understanding (e. g., Sutcliffe Storage & Warehouse Co. v. United States, 112 F. Supp. 590, 125 Ct.Cl. 297 (1953); Jones & Sears, Inc. v. United States, 158 Ct.Cl. 162, 172–173 (1962)), the courts generally, as well as this court, have been wary in granting relief from innocent mutual mistakes imbedded in, or under-

7. It is noteworthy that plaintiff did not make its final price proposal until after the discussion as to plunge grinders. It may very well be that, in calculating that price, plaintiff took some account of the defendant's refusal to authorize plunge grinders. Moreover, when plaintiff agreed, in June 1954 (on reinstatement of the supply contract), to a fixed price of $5.2499 it knew that turning equipment had not been authorized.

lying, consummated contracts.[8] With this tacit warning, we must tread carefully since there was no mistake in the written formulation of the understanding here; the formal contract embodied the actual agreement as the parties thought it to be. But we feel impelled, nevertheless, to consider the problem of mistake because, in our view, there was a definite mutual mistake as to a very material fact—an innocent mistake which apparently led the contractor, without fault, to a large loss.[9] It is proper to decide whether, in these circumstances, any relief is open to plaintiff under the law we administer or whether the loss must simply rest where it dropped.

The mutual mistake was this: It was important to the Government to create stand-by facilities using the hot cup-cold draw method of making shells. Both parties hoped to make the shells under this process without any turning equipment, so as to diminish the wastage of steel to the greatest extent possible. Plaintiff's trials over a considerable period demonstrated, however, that this new method could not efficiently be used for mass production without one turning step at which some excess steel was removed from the shell. The main objective of the new method was to save much of the scrap steel resulting from the conventional hot forage process. That end was still reached, but not as completely as initially expected. Much steel was saved, but less than hoped. Some turning was still necessary. This critical fact the Government certainly did not know at the time of the negotiations and the execution of the contracts

with plaintiff.[10] The defendant was unaware, also, that it would take much time and effort to discover the truth.

The plaintiff had premonitions that some sort of turning *might* be required, but it, too, did not *know* of the necessity of a shaving step; more particularly, plaintiff had no idea that it would be hard to determine this need. We are convinced from the record that, when plaintiff signed the formal contracts, it did not enter the arrangement with the feeling that it would fail, or encounter grave difficulty, because of the lack of turning equipment. It expected to succeed. Even assuming that the request for plunge grinders was equivalent to a request for a mechanism performing as the lathes later did—an assumption defendant challenges[11]—plaintiff's conduct shows that for quite a while it thought and hoped that, though it would be good to have turning equipment, the process could function effectively without such devises. Plaintiff accepted defendant's refusal to include plunge grinders, though the negotiations could have been ended right there. Plaintiff then proceeded well along on that basis, without referring again to turning equipment. In October 1955, after the first run of shells at Eau Claire, plaintiff's director of engineering gave a public address mentioning the absence of a turning step and suggesting the success of plaintiff's use of the hot cup-cold draw process. The difficulties came later when production was increased. Even then, it was not until prolonged efforts to operate properly at Eau Claire without a turning step, together with some ex-

---

8. See 3 Corbin, Contracts (1960 ed.), § 597 et seq.; Note, "The Application of Common-Law Contract Principles in the Court of Claims: 1950 to Present," 49 Va.L.Rev. 772, 789–95 (1963); Doke, Mistakes in Government Contracts—Error Detection Duty of Contracting Officer, 18 Sw.L.J. 1 (1964), esp. at pp. 40–43.

9. We qualify the statement by "apparently" since it has not yet been decided how much of the claimed loss was attributable to the mistake.

10. A smaller one-line plant, which did not use a turning step, had previously made shells for the Government by the new process.

11. On defendant's view that plunge grinders were irrelevant to the turning problems later encountered in performance, there is a stronger case for finding that plaintiff (as well as defendant) was mistaken.

perimentation with a lathe imported from Menomonie, that plaintiff (as well as defendant) finally determined that additional equipment was needed for steel removal after the hot forging phase of the new process. In arguing that the defendant should be held liable for a breach because it was warned of the need for turning equipment, plaintiff has over-stressed its own knowledge during the pre-contract stage. The truth, as we see it, is that neither side had the knowledge plaintiff now attributes to itself; plaintiff wanted the plunge grinders for insurance but both parties were under the misapprehension that, given proper engineering, the new process could be utilized without any turning step. Before us, defendant still argues that lathes only became necessary because of plaintiff's faulty design of the dies, but we conclude, from the history of the contract as well as defendant's own ultimate support of the lathes, that the parties were right when they ultimately decided that the process would not work properly for mass production without turning equipment.[12] In short, the parties reasonably labored, for most of the contract period, under a mutual mistake as to a most material set of facts. And that mistake was not understood until the plaintiff had tried, with defendant's approval, for quite a while—and apparently with the expenditure of considerable money—to make the shells without turning equipment.

Thus, the parties' arrangement was infused throughout, on both sides, with mutual ignorance of two essential facts —the need for turning equipment; the time and work required to establish that need—but the products of that mutual ignorance now weigh wholly upon the contractor. The defendant has paid the contract price and received its shells. The plaintiff has received the contract price but is left with a large loss which (we assume for present purposes) is due to the common error. This is not a case in which one party merely seeks to be excused (usually through rescission) from failing to perform because of a mutual mistake. This is a case where a party which has received the stated consideration asks for greater compensation, over and above the contract price, because of the mistake.

The courts have thus far chosen, in passing upon claims of the latter type, to hug closely the notched coastlines of the particular litigations,[13] rather than to chart straight paths across the troubled sea. As we have noted, it is difficult to find general principles or a devoloped body of law. This caution, which we accept, follows the wisdom of the common law; premature generalization can bear strange fruit. Nevertheless, there are some existing guidelines which we can usefully follow.

█ In denying a claim for increased compensation tied to a mutual mistake, we recently pointed out that "a mutual mistake as to a fact or factor, even a material one, will not support relief if the contract puts the risk of such a mistake on the party asking reformation * * * or normally if the other party, though made aware of the correct facts, would not have agreed at the outset to the change now sought * * *." Flippin Materials Co. v. United States, Ct. Cl., 312 F.2d 408, 415, decided Jan. 11, 1963. The contractor in Flippin fell before both of those obstacles. Here, we are impelled to find that plaintiff is able to surmount both, perhaps not in Olympic fashion but well enough.

Did plaintiff assume the whole risk? In the first part of this opinion we considered whether the Government, under the contract, should bear the entire risk of the error as to turning equipment.

12. Other lines using the new process employ turning equipment. The smaller plant which had not used such machines (see fn. 10, supra) did not engage in speedy mass production.

13. Cf. 3 Corbin, Contracts (1960 ed.), § 598; Virginia Engineering Co. v. United States, 101 Ct.Cl. 516, 532–533 (1944); Peter Kiewit Sons' Co. v. United States, 74 F.Supp. 165, 168, 109 Ct.Cl. 517, 522–523 (1947).

We decided that it should not. The main problem in this second facet of the case is whether the contract placed that whole risk on the plaintiff. The answer is not easy, but we conclude that neither the written contract nor the course of dealings requires that plaintiff alone bear the full consequences of the parties' mutual error as to the need for turning equipment. The contract contained no disclaimers of Government liability or warranties by the plaintiff. As we see it, this was a new and joint enterprise in which neither party had any real expertise or background. The hot cup-cold draw process was novel and the results could not be predicted accurately. The Government was interested not only in the end-product—shells—but just as much in the perfection of the new process. The plaintiff was to be the active partner; it would undertake the study and experimentation, then suggest the procedures to be used, and finally carry out the experiment. But this was not a performance contract; plaintiff was not an expert, promising to perform and taking the whole risk and anxiety of the project off the Government's shoulders.[14] Plaintiff was, rather, the more active of a pair of gropers attempting to develop a new and largely untried process which was still far from mature. Possibly, in Professor Corbin's phrase, plaintiff may have bet that turning equipment would not be needed, but we do not think it bet as to the time and effort which would be necessary to determine that fact. The crucial error was as to the work necessary to show the need for turning equipment. On that point, there was no consideration and no discussion; both sides seemed to believe that such a need would be speedily shown or disproved. There is insufficient ground in the parties' negotiations, or in the transaction as a whole, for saying that the plaintiff, alone, assumed the risk that the period of proof would be long and arduous, costing the large sums it did.

Plaintiff's acceptance of a fixed-price contract, instead of some form of cost-plus arrangement or research-and-development contract, could suggest the allocation to it of all uncovered risks. But in this case that solution would be too facile for a risk connected so directly with the equipment to be used. Since the Government was to pay for the machines,[15] in the area of equipment the agreement was at least as close to a cost contract as to a fixed-price one. Moreover, even if the fixed-price covered the costs of a short period of testing to decide whether turning equipment was needed, it is hard to hold that it also covered a long period entailing very large expenses.[16] It should not be said, in all the circumstances, that the agreed fixed-price in-

---

14. In The Austin Co. v. United States, Ct.Cl., 314 F.2d 518, decided March 6, 1963, cert. denied, 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 62 the contractor deliberately rejected the defendant's specifications as unworkable, substituted its own proposal, and assured the defendant that a contract based on its specifications could be performed and would result in a device of greater precision than called for by the defendant's original plans. In these circumstances the court held that the contractor entered into the arrangement with its eyes open and fully assumed the risks of impossibility of performance. In Carnegie Steel Co. v. United States, 240 U.S. 156, 36 S.Ct. 342, 60 L.Ed. 576 (1916), the contractor was a well-known steel firm undertaking to make a certain form of steel plate; in the circumstances the Court did not view the undertaking as tentative or experimental but as a performance contract in which the expertise was with the plaintiff.

15. Including (as it turned out) the cost of the turning equipment itself.

16. Plaintiff received some $980,000 for the 180,000 shells produced at Eau Claire by the new method, and lost some $750,000 in that phase of its production. Although we do not yet know the precise part of this loss attributable to the problem of turning equipment (see *infra*), it seems probable that the cost of testing the need for, and then using, turning equipment was very large in comparison to the plaintiff's revenue from its sale of the shells to the Government.

cluded the full risk that the contract could not be effectively performed without turning equipment. Our best judgment is that the specific risk as to the cost of proving that fact was not distributed, explicitly or implicitly, by the arrangement the parties made. The defendant did not assume that hazard, but neither did the plaintiff.

The second prerequisite to recovery for mutual mistake mentioned in Flippin is that the other party, if made aware of the true facts, "would have agreed at the outset to the change now sought." This factor should be examined so as to avoid imposing, through reformation, an arrangement wholly alien to the parties' desires and basic plan. If the actual facts were known, to what would the Government have consented here? [17] Plainly it would have agreed to pay for turning equipment [18]—but that does not help us now since the defendant has already paid for the lathes. The sticking point is the responsibility for the costs of determining that turning equipment was essential. To deal justly with the error in this case, we have to presuppose that, during the negotiations, the parties recognized that it might well take much time and expense to decide whether or not turning equipment had to be used. In that event the defendant might have agreed to bear all of this cost, to bear none of it, or to share it with the contractor. Perhaps defendant's officials would have refused to incur any of this expense, but we think not since the Government was anxious to establish a production line for the new process which would omit turning equipment. The proving-out of this point would be for the Government's benefit; defendant would therefore be willing to participate in discovering whether the ideal goal could be attained and in making sure that the original aim of a production line without turning equipment was beyond reach. Plainly, the fixed-price proffered by plaintiff after the elimination of the plunge grinders did not contain a contingency allowance adequate for a lengthy period of trial and error; if that happened, the contractor would suffer a grave set-back. The defendant would not, we think, have insisted on taking the whole of such a toll. [19] Perhaps, on the other hand, defendant would have consented to carry, as an extra, all of the cost of a protracted testing period —but again we think not. The Government would have thought, as we do, that *some* allowance for this expense was already included in the fixed-price. The defendant would also have wanted to be certain that the testing period was as short, economical, and efficient as possible, and that at the close of the tests plaintiff used the turning devices promptly and effectively. A promise of full reimbursement for all expenses actually incurred would dampen the stimulus to keep the testing efficient and the costs low. In sum, we think that Ordnance would have been willing to bear part, but not all, of the actual testing (and consequent) expenses.

Flippin does not say that, if the two prerequisites we have just discussed are fulfilled, then relief for a mutual mistake follows as of course. These are necessary conditions but they may not be sufficient. The argument can be advanced that relief for a mutual mistake, through additional compensation to the contractor, should be left

17. This presupposes that the plaintiff did not assume the risk of the mistake.

18. The defendant's chief representative did agree, orally, during the precontract negotiations to pay for plunge grinders if they proved necessary.

19. In this case we need not be concerned with other bidders or would-be contractors to which the defendant might have

turned. There is no reason to believe that, after Ordnance decided to change this procurement to the new method, there were any other firms under consideration. By the time of the switch to the hot cup-cold draw process (at the end of June 1953), the parties had already entered into the letter contracts (on June 4, 1953), and there is no indication that defendant would have dealt with any other manufacturer.

to legislation or administrative discretion.[20] We think, however, that the federal courts can and should proceed under the Tucker Act, now as in the past, to develop and establish just and practical principles of contract law for the Federal Government. Judicial reformation for mutual-mistake-of-fact is not new (see fns. 8 and 13, supra, and cf. Harrison Engr. & Constr. Corp. v. United States, 68 F.Supp. 350, 351–352, 107 Ct.Cl. 205, 208 (1946)); and though the particular result here may be unprecedented that is, of course, the way of the common law. Then it may be said that to grant compensatory relief where neither side assumed the specific risk departs too far from the parties' actual understanding; it may be better to let the chips lie where they fall. Cf. 3 Corbin, Contracts (1960 ed.), § 598, p. 589; 5 Williston, Contracts (rev. ed., 1937), § 1548, pp. 4339, 4341. But it

is unsatisfactory to tell a party who did not, either in terms or by fair implication, assume a certain heavy risk that he *alone* must bear it simply because of the happenstance that it fell to his lot. Particularly is this so where, as here, the unexpected occurrence led to a period of extra work which was not useless to the other party.[21] It is at least equally logical and decidely more just to divide the cost between the two parties, neither of whom can be properly charged with the whole. We are rightly admonished, in the region of mutual mistake, to seek just solutions. See 3 Corbin, supra, § 597, p. 583, esp. fn. 6, § 605, pp. 640–642, esp. fns. 94–95. By the same token we need not be stopped short by the fear of opening Pandora's box. To do justice here we need go no further than formulate and apply a rule for cases of mutual mistake in which the contract, properly construed,

20. For most of the time since the early days of World War II, the main defense agencies have been authorized, under Congressional enactments and Executive Orders, to grant discretionary relief to many contractors suffering losses on account of mistakes. Title II, Section 201, of the First War Powers Act, 55 Stat. 838 (1941); Executive Order No. 9001, 6 F.R. 6787 (1941); Act of Jan. 12, 1951, 64 Stat. 1257; Public Law 85–804, 72 Stat. 972, 50 U.S.C. §§ 1431–1435 (1958). See Rowley, "The First War Powers Act Cases," in Shepherd, Cases and Materials on the Law of Contracts (2d ed. 1946), pp. 1233–1261; Fain and Watt, War Procurement—A New Pattern in Contracts, 44 Col.L.Rev. 127, 194–206 (1944); Kramer, Extraordinary Relief for War Contractors, 93 U. of Pa.L.Rev. 357 (1945); Correction of Mistakes in Contracts Under Public Law 85–804, Government Contracts Monograph No. 1 (The George Washington Univ.) (1961).

21. Through this prolonged period of trial and error the Government learned that it could not effectly mass-produce shells by the hot cup-cold draw method without turning equipment. This was a fact the defendant wanted to discover under this contract, not an extraneous benefit.

We do not believe that plaintiff has forfeited all right to relief because it did not stop during the testing period—once

it knew that its costs were mounting— and seek a price adjustment. At each step of the testing it may have believed that the final solution was near, and manufacture of the shells would then proceed without interruption. Cf. Ekco Products Co. v. United States, Ct.Cl., 312 F.2d p. 773, decided January 11, 1963. In any event, if the defendant had refused an increase (as is likely at that stage) the plaintiff would then have been put to the unduly harsh choice of (1) stopping performance and risking all the consequences of a notice of default-termination, or (2) continuing performance after the defendant's explicit refusal to pay anything extra under a contract which (as it stood) did not require such payment. The Government, on the other hand, did not suffer materially (under our disposition of the case) by the plaintiff's failure to ask for an increase during performance. The Government has obtained proof that turning equipment was necessary, but it is not called upon to pay all the costs of that proof. If the contract had been terminated during the testing period, defendant either would have had to hire someone else to discover whether turning was essential or given up finding an answer to that question. As Part II of our opinion implies, the defendant would not have been able to obtain reimbursement from the plaintiff if the contract had been terminated for default.

allocates the specific risk to neither party [22]—and the side from whom relief is sought received a benefit from the extra work of the type it contemplated obtaining from the contract, and would have been willing, if it had known the true facts from the beginning, to bear a substantial part of the additional expenses. Cf. Virginia Engr. Co. v. United States, 101 Ct.Cl. 516, 532–533 (1944).

For such a case it is equitable to reform the contract so that each side bears a share of the unexpected costs, instead of permitting the whole loss to remain with the party on whom it chanced to light. In contract suits courts have generally seemed loath to divide damages, but in this class of case we see no objection other than tradition. Reformation, as the child of equity, can mold its relief to attain any fair result within the broadest perimeter of the charter the parties have established for themselves.[23] Where that arrangement has allocated the risk to neither side, a judicial division is fair and equitable. The division can follow from the special circumstances if there are any; in their absence an equal split would fit the basic postulate that the contract has assigned the risk to neither party.

In the present instance it might theoretically be possible to calculate (i) the cost of the most economical and efficient process of testing whether turning equipment was necessary for mass production and then of using the lathes once they were found essential,[24] and (ii) the contingency allowance (for such testing and use of turning equipment) included in the fixed price—and then to charge the defendant with the first less the second. But these refined figures seem to us overly difficult to discover and prove. There are no ready-made gauges of efficient testing in such an untried field; and at this time the plaintiff's allowance for this possibility might be quite unfathomable. Moreover, we are not sure that the defendant should be saddled with all the additional costs, even as pared to the bone. We consider it more practical, but nevertheless fair, to halve the loss and hold defendant responsible for an equal portion.

The Trial Commissioner has found the loss plaintiff suffered in making the shells at Eau Claire, but he has not determined whether and to what extent that loss is attributable to (a) the costs of testing to see whether turning equipment was required and (b) the extra costs of manufacturing with the lathes. Also, the Commissioner has referred to other difficulties in production but has not indicated whether (and to what extent) these other problems contributed to the loss he has found. From the materials available to us we cannot readily make these determinations. We therefore remand the case to the Commissioner to find what part of the total loss should be attributed to the mistake over the turning equipment. The plaintiff should recover one-half of the portion of the total loss so delimited.

Plaintiff is entitled to recover in accordance with this opinion, and judgment is entered to that effect. The amount

---

22. In turn, as indicated above, we base our holding that the contract here did not assign the risk to plaintiff on the particular facts of this case, especially the novel and experimental character of the project and the seriousness of the unexpected costs in relation to the contract price.

23. Corbin refers to "the extent of judicial power and the flexibility of equitable remedies" in the law of mistake. 3 Corbin, supra, § 597, p. 583, fn. 6.

24. Although defendant approved plaintiff's lengthy course of trial and error in determining whether turning equipment was essential, it is not fair to infer from the Government's approval that plaintiff must have used the most economical and efficient method of testing, and then of using the lathes. We can properly assume that defendant's representatives thought that plaintiff would bear the full cost of testing and manufacturing; from their viewpoint it would not matter whether the plaintiff's work was somewhat wasteful or unduly prolonged.

of recovery will be determined under Rule 47(c) (2).

WHITAKER, Senior Judge (dissenting).

It cannot be denied that the result reached by the court in this case would be a fair and just one, *if the contract between the parties permitted it.*

The parties could have contracted between themselves that if the cost of doing this work turned out to be expensive beyond reasonable expectations, the parties should be equally charged with the excess. But this is not what they did. The plaintiff agreed to do the work for a fixed sum. There was no provision in the contract for the payment of any additional sum if the cost of doing the work turned out to be much greater than had been expected. Indeed, neither party knew how much work would have to be done to ascertain whether the cold-cup process would work without the use of a grinding machine, and yet the contractor agreed to do the necessary work for a fixed sum.

Furthermore, as the work progressed and costs mounted, the plaintiff never told defendant that its costs were far in excess of what it had anticipated, and never requested the Government to pay any part of the excess. No contractor can charge the Government with any part of unanticipated costs, except those coming within the "Changes" articles, where the contract provides that the plaintiff should do the work for a specified sum. To require the Government to pay an amount in addition to the stipulated sum, because the contractor incurred greater expense than he had anticipated, would leave the Government in a wholly untenable position, never knowing what a job was going to cost it, although the plaintiff had contracted to do it for a specific sum.

Many times when the Government asks a contractor to do an exploratory job, the cost of which is uncertain and which neither party can foresee, the parties enter into what are sometimes called research and development contracts, under which each party agrees to share in the cost of doing the work. That is what the parties probably should have done in this case, but they did not. The plaintiff undertook to do the work for a fixed sum, and, in my judgment, that is all it is entitled to recover. That is all the Government agreed to pay, and that is all the Government should pay. As a matter of generosity, the Government might well have agreed to pay the additional expense, but no court can require a person to be generous; it can only require him to be just.

Even a mutual mistake as to an antecedent or existing fact does not justify reformation of a contract (Maryland Cas. Co. v. United States, for Use of Green, 8 Cir., 169 F.2d 102 and cases there cited), but, even if it did, I cannot see that there was any mutual mistake of fact in this case. The defendant did not know what it would cost plaintiff to do the work nor, I suppose, did plaintiff, although plaintiff thought it knew when it agreed to do the work for a fixed sum. Plaintiff was mistaken, but the mistake was only plaintiff's and not that of the defendant. There was no *mutual* mistake of fact. When plaintiff agreed on a fixed price, it assumed the risk of doing the work for this sum; defendant did not agree to share the risk. Even if contracts could be reformed for a mistake about a fact supposed to exist or to have existed at the time the contract was agreed upon, they certainly cannot be reformed because the parties could not accurately foretell the future.

I sympathize with the plaintiff, but it made a contract and it is entitled to recover only according to that contract. I regret to dissent, but I must.