**NORTH AMERICAN PHILIPS COMPANY, Inc., and Philips Electronics, Inc., Third-Party Plaintiff**

v.

**The UNITED STATES.**

Cong. 1–60.

United States Court of Claims.
April 15, 1966.

Joseph H. Elcock, Jr., Boston, Mass., attorney of record, for plaintiff.

Frances L. Nunn, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

DURFEE, Judge.

This is an action for delay damages and added engineering costs not compensable under the changes clause or any modification to the contract in issue. North American Philips Company, Inc., the nominal plaintiff, and Philips Electronics, Inc., a sister corporation, are both referred to interchangeably as plaintiff. North American Philips Company has no present interest in the outcome of the present suit, the real party in interest being the transferee of North American's interest in the contract— Philips Electronics.

This case is before the court on a Congressional reference. It is also one within the general jurisdiction of the court. It is therefore one on which, under 28 U.S.C. § 1492 (1964 ed.) the court may render judgment.

In 1952 defendant entered into a contract with A.R.F. Products, Inc. (hereinafter ARF) for development and production of signal generators.[1] Under this contract ARF was additionally required to furnish a complete set of finished production drawings from which copies could be made for future procurements. By November, 1954, defendant determined the need for procurement of additional signal generators; however, ARF had not yet completed work on the development and production contract, and therefore, the production drawings for the generators had not yet been completed. Despite the absence of production drawings for the signal generators, the authorized engineer representative of defendant decided to proceed with the procurement and instituted bid procedures. Bid invitations were then issued on January 18, 1955. These invitations contained a statement that drawings were not available.

Between issuance of bid invitations and submission of plaintiff's bid on February 18, 1955, defendant had on display at Fort Monmouth a model of the signal generator, and had representatives there to give advice and information to bidders. The model was assembled and it was not possible to make a detailed examination of its components without disassembly, which was not permitted. Also available for examination by bidders were specifications and a copy of the Army Technical Manual containing descriptive data, pictures, diagrams, and a probably inaccurate and incomplete parts list of the signal generator. Representatives of plaintiff spent a day at Fort Monmouth obtaining the information relevant to the procurement. On that occasion they were also told that, although it was not then

---

1. ARF previously was the contractor on a research and development contract with

defendant relating to the development of the signal generator.

known when ARF would deliver its production drawings to the Government, the drawings, when available, would be furnished the successful bidder for the pending new procurement.

Hindsight shows that the information which was available to plaintiff and the other bidders at Fort Monmouth was sufficient to make only an inexact estimate of costs for bid purposes. Examination of production drawings and disassembly of the display model would have been necessary for a more accurate estimate of costs. It is customary and desirable in comparable procurements to furnish production drawings to bidders, but it is also not uncommon in procurement of equipment of complexity comparable to a signal generator that production drawings are not furnished bidders because they are not available as in this instance. Hindsight again shows a substantial risk involved in plaintiff submitting the bid under these circumstances, however at least 26 other firms besides plaintiff submitted bids in this particular procurement, thus alleviating to a large extent the question as to plaintiff's wisdom in taking a chance on misjudgment.

Plaintiff's bid of $644 per unit was the lowest responsive bid. In addition to the signal generators, plaintiff was to supply a set of reproducible vandykes of manufacturer's own drawings [2] and about 44 production drawings for the case and dummy load, accessories to the signal generator. The bid estimate provided $15,000 in engineering costs and $5,000 for the drawings, of which $185 was for the vandykes. The contract was awarded plaintiff on May 20, 1955 to deliver 652 signal generators plus accessories and drawings. In June 1955 the quantity was increased by 355 units at a reduced price of $619 each. The units were to be delivered in installments from March through October, 1956, with the schedule later revised to commence in August 1956 and to be completed March, 1957. The contract specifications stated that unless otherwise specified, all components of the signal generator "shall conform to the model," and further that "where drawings or a model are supplied to the contractor for his guidance, * * * this specification and any specification to which it is subsidiary shall govern over the drawings or model."

A brief summary of what has transpired is now in order so that the events that followed may be seen perspectively. In summarizing these events, we shall also look at the parties' intent as it must be remembered that "in the case of contracts the avowed purpose and primary function of the court is the ascertainment of the intention of the parties." Williston on Contracts, Third Edition, section 601; Union Pacific Railroad Co. v. United States, 10 Ct.Cl. 548 (1874), aff'd United States v. Union Pacific Railroad Co., 11 Ct.Cl. 1, 91 U.S. 72, 23 L.Ed. 224 (1875); Chase and Rice, Inc. v. United States, 354 F.2d 318, 173 Ct.Cl. —— (December 1965).

Plaintiff had compiled its bid based on a copy of the specifications, the descriptive data in the Army Technical Manual, an inspection of an assembled model, and an incomplete parts list. Plaintiff knew that the ARF drawings were not available for bid purposes, but had been assured that when they were available, they would be furnished as an aid in the manufacture of the signal generators. Plaintiff also knew that the ARF drawings were being made from a prior procurement of the signal generator and undoubtedly expected the drawings when delivered to be capable of use

2. "Manufacturer's own drawings" are substantially different from production drawings in that they are less formal and not necessarily as accurate or complete as production drawings, since they primarily serve the internal needs of the particular contractor, as opposed to other potential contractors. For example, manufacturer's own drawings may be mere sketches instead of finished production drawings, which latter permit any competent manufacturers to produce according to specifications. Vandykes are copies of drawings made on translucent paper with heavy ink.

in production. Plaintiff, therefore, took a risk in underestimating the cost of materials (materials not called for in information available) for completion of the signal generator by bidding without seeing production drawings and the disassembled model; however, plaintiff believed that any production drawings received would be complete and workable, supplying any omissions, and also helpful in assembly. Plaintiff could not have relied on any more help from the drawings than that stated above since the specifications in the invitation and the resulting contract both stated that the completed item "shall conform to the model," and that the specifications governed over the drawings or model.

Defendant also must have expected the completed drawings from ARF to be suitable for procurement purposes, and helpful to the successful bidder in supplying omissions and in assembling the item. This conclusion is based on two facts—first, research and development, and development and production contracts had been given to ARF to originally procure the signal generators, and the procurement had been successfully accomplished and, second, the production drawings required from plaintiff under the contract related only to generator accessories, not to the actual item itself, thus implying confidence that ARF would supply complete drawings for the generator.

Keeping the above analysis in mind, we return to the subsequent events of this controversy. The ARF production drawings were delivered to defendant on April 27, 1955. Defendant reviewed and approved them on May 16, 1955, four days prior to the award of the contract in suit to plaintiff. However, they were not checked by the Government to determine whether they accurately reflected the ARF signal generator, and defendant advised plaintiff that it was uncertain of the accuracy of the drawings. The availability of these ARF drawings obviated the need for the drawings plaintiff was to supply with its contract,

and created a new need for revision and correction of the ARF drawings (since they had not been checked for accuracy by defendant). Therefore on June 15, 1955, the requirement that plaintiff supply vandykes and the 44 accessory drawings was deleted from the contract, along with the $5,000 cost of the drawings ($185 of which covered the vandykes), and in lieu thereof was added to the contract a requirement for plaintiff to make changes in the ARF production drawings to insure their compliance with contract specifications, with an equitable adjustment in price to be negotiated upon final acceptance of plaintiff's revised drawings by defendant. The drawings were then delivered to plaintiff. This agreement was formally confirmed by the adoption of Modification 3 to the contract under the standard changes clause. Paragraph h of Modification 3 stated:

It is understood that the contractor agrees to thoroughly check Government furnished drawings covered by SC–DL–72536 for Signal Generator SG–12/U, SC–DL–72540 for Dummy Lead DA–69/URM–48, and SC–DL–72556 for Case CY–1217/U against the Government furnished models of those components and applicable specifications. The contractor will be permitted to disassemble models in order to thoroughly check the drawings. Conflicts in design, construction, and characteristics between exceptions listed in bid request and contract, specifications, model, and drawings shall be resolved, and resulting changes incorporated on the drawings, as follows: The requirements of the applicable specifications and exceptions listed in the bid request and contract govern over the models and drawings; the models govern the drawings, dimensional differences between models and drawings, and all other problems related to drawing revisions, shall be resolved by consultations with the Field Engineering Branch, Signal Corps Engineering Laboratories. Subsequently, construction of the equipment on

order shall be in accordance with these revised drawings. Performance of the equipment shall be as specified by the specification (with noted exceptions). The responsibility for assuring that the drawings have been corrected will be the contractor's, and the Government will not be responsible for damages or extra costs as a result of the inaccuracies or omissions in the corrected drawings. The contractor agrees to furnish the contracting officer a complete statement detailing his operations in the checking of the Government drawings.

Under Modification 3 the specifications still governed over the model and drawings. Before plaintiff could go into production, all drawings had to be checked and corrected, as under the modification "construction of the equipment on order shall be in accordance with the drawings." In other words, another process or step was added to the contract, and such process was a *prerequisite* to completion. The drawings were no longer to be used as a mere aid to plaintiff in supplying omissions and in assembly line production, but instead, became the life-blood of production. The ultimate construction *had* to be in accordance with the revised drawings. Modification 3 contemplated equitable adjustment for extra work, but contemplated no adjustments for delays and costs attendant to delays in completing the contract, including engineering costs that might be incurred as a result of the added work.

It has previously been shown that both parties expected the drawings to be fairly accurate—this probably accounts for the reason no mention was made of possible delays in Modification 3. It should also be noted that the original $15,000 allocation of funds for engineering costs was not deleted or changed by Modification 3 when the cost for the original drawing revision and vandykes was deleted, thus evidencing the feeling that

engineering costs in correcting the ARF drawings would not be great, and in no event, would exceed the $15,000 prior maximum.

Plaintiff now contends that the ARF drawings supplied by the Government were defective and not in accordance with either the model or the specifications, and that both the model and the specifications were not only in conflict with each other but were also defective and described a product not ready for manufacture as a production item. The question of liability, therefore, depends on the correctness of plaintiff's contention, and also whether or not the correction of the alleged deficiencies caused plaintiff undue delay in the completion of the contract and added engineering costs not compensable under the contract. Whether or not plaintiff's contentions are valid rests to a large extent upon evidence offered in two categories—changes in specifications, and revisions in the drawings.

Plaintiff submitted 21 TARs [3] for examination at trial. These TARs had been approved by defendant during contract performance upon the contingency of no change in contract price or delivery. Of the 21 examined, we have found that the research and engineering necessary to ascertain the need for the issuance of six of the TARs caused plaintiff delay. These delays are not thus far reduced to a precise measurement in terms of time or money, but should be considered with other delays mentioned infra in an effort to estimate the total delay period of this contract. In addition to the delay were added engineering costs for which plaintiff was not compensated in the sum of $6,235.50.

Plaintiff's evidence of drawing revisions was that it had over 1,000 changes to make in 600 ARF drawings, and that only a relatively few required no change. At trial, plaintiff selected 21 specific

3. TAR, an abbreviation for Technical Action Request, is a formal request initiated by the contractor for Government approval for a deviation from contract requirements or a change in specifications.

drawings which it considered represented problems of particular significance with respect to deficiencies, resulting in delay, and referred collectively in general terms to the inadequacies of the other drawings not made the subject of specific evidence. It may be concluded that on the whole, the ARF drawings were inaccurate, incomplete and misleading to plaintiff. Many of the revisions were not made to correct errors, though, but made to supply omissions in both the drawings and the equipment itself which the Government, or a less conscientious contractor than plaintiff, may not have felt compelled to make under the requirement of Modification 3. However, of the 21 representative drawings considered in detail, more than 50 percent showed revisions necessary to correct basic errors. The drawings as ultimately revised by plaintiff were greatly improved over the ARF drawings, and supplied detailed data and information which plaintiff or succeeding manufacturers of the signal generator would have found adequate for manufacturing purposes, whereas the ARF drawings were inadequate for manufacturing purposes. The actual extent of revisions to the ARF drawings and improvement of the equipment was not anticipated by plaintiff, and caused it substantial delays in contract performance and research engineering costs for which equitable adjustment ultimately paid provided no reimbursement.

■■ Plaintiff is therefore entitled to recover. It has previously been shown that prior to the addition of Modification 3 to the contract, plaintiff reasonably expected the drawings to be useful in production. This explains the fact why the question of delays or added engineering costs was not mentioned in and/or made a part of Modification 3. The modifica-

tion was added to the contract at defendant's insistence. It materially altered the contract by adding the provision that all drawings had to be checked and corrected as a prerequisite to production, and that construction had to be in accordance with the drawings. Absent Modification 3 such a material change in the contract requirements would have constituted a breach. Under Modification 3, however, plaintiff agreed to the provision that the corrections would be made, and that this construction would be in accordance with the drawings, with an equitable adjustment for extra work. At first glance it might appear that plaintiff had made a poor bargain, and must suffer the losses. But it must be remembered that under the modification, production *had to be based on the drawings*. The drawings, therefore, became the ultimate specifications. It was expected by defendant and plaintiff that only minor changes would be made in the drawings, that engineering costs would not exceed the $15,000 originally allocated by plaintiff, and therefore, that the supplied drawings would, with the minor corrections, be usable for producing the item. In fact, as has been shown, they were not usable. As the ultimate specifications, the ARF drawings became subject to the rule that the Government implicitly represents that if its specifications are complied with, satisfactory performance will result. R. M. Hollingshead Corp. v. United States, 111 F.Supp. 285, 124 Ct. Cl. 681 (1953); National Presto Industries, Inc. v. United States, 338 F.2d 99, 105, 167 Ct.Cl. 749, 758–759, fn. 6 (1964), cert. denied 380 U.S. 962, 85 S. Ct. 1105, 14 L.Ed.2d 153 (1965). This warranty was breached, and recovery is therefore mandatory in this instance.[4]

While it is true that no duplicity was involved on defendant's part in requiring the material change in Modification 3

4. Defendant's warning to plaintiff of possible inaccuracies at the time of delivery of the ARF drawings just prior to the incorporation of Modification 3 to the contract, did not act to disclaim the warranty. This warning merely served notice to plaintiff that defendant had not checked the ARF drawings. It did not inform plaintiff that the ARF drawings were inadequate for manufacturing purposes.

(defendant presuming the drawings were fairly correct) defendant being the procurer and supplier of the drawings must bear the responsibility for the damages that resulted from the change in requirements. This rule is no harsher than construing an ambiguous contract against the party that drew it, and in fact is somewhat parallel. The fact that defendant presumed the drawings to be useful in production does not alter its warranty, as presumably in all contracts, defendant at the outset believes its specifications to be accurate.

Defendant places much reliance on part of paragraph h, Modification 3 which stated:

The responsibility for assuring that the drawings have been corrected will be the contractor's, and the Government will not be responsible for damages or extra costs as a result of inaccuracies or omissions in the corrected drawings.

Defendant reads this sentence as a disclaimer on its part relating to the costs incurred in correcting the ARF drawings. This court does not read the above quote in the same light. The corrected drawings referred to are plaintiff's, as are all references to drawings in prior sentences in the paragraph.

Accordingly, we hold as follows:

(1) Plaintiff is entitled to damages for delays incurred in changing specifications (The TARs) so that drawings could be completed, and in correcting errors in drawings. Mere improvements in the drawings were not required by Modification 3 and should not be considered in figuring the delay.

(2) Plaintiff is entitled to the added engineering costs to the extent that no remedy was available for such costs under Modification 3, or the changes clause of the contract.

Judgment is hereby entered for the third party plaintiff, Philips Electronics, Inc., the real party in interest, with the amount of recovery to be determined under Rule 47(c).